In re Michael J. RANDY, Debtor.

Philip V. MARTINO, as Trustee for the Estate of Michael J. Randy, Plaintiff,

v.

EDISON WORLDWIDE CAPITAL, Defendant.

Philip V. MARTINO, as Trustee for the Estate of Michael J. Randy, Plaintiff,

v.

David JOHNSTON, Defendant.

Philip V. MARTINO, as Trustee for the Estate of Michael J. Randy, Plaintiff,

v.

Buford F. HOUCK, a/k/a Ben Houck, Defendant.

Bankruptcy No. 93 B 19274. Adv. Nos. 94 A 01172, 94 A 01195 and 95 A 00208.

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Nov. 8, 1995.

Mark P. Naughton, Elizabeth A. Graber, Rudnick & Wolfe, Chicago, IL, for Plaintiff.

Patrick A. Davis, Clearwater, FL, for Defendants Edison Worldwide Capital and David Johnston.

Buford F. Houck, Ironton, OH, Pro Se.

### MEMORANDUM OPINION ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

JACK B. SCHMETTERER, Bankruptcy Judge.

The above-captioned Adversary proceedings each relate to the involuntary bankruptcy case filed on May 12, 1993, by creditors of Michael J. Randy ("Debtor") under Chapter 7 of the United States Bankruptcy Code, 11 U.S.C. ¶ 101 *et seq.* ("Code"). An order for relief was entered therein on June 17, 1993, and Philip V. Martino was appointed Trustee. Plaintiff Martino, as Chapter 7 Trustee ("Trustee" or "Plaintiff"), filed these three Adversary complaints against Defendants Ben Houck ("Houck"), David Johnston ("Johnston"), and Edison Worldwide Capital ("Edison").

In Count I of the complaints against Houck and Edison, the Trustee seeks to recover alleged fraudulent conveyances under 11 U.S.C. § 548(a)(1). The amount that the Trustee is seeking to recover from Defendant Houck under Count I is $6,132.00, plus interest and costs. Under Count I of the complaint against Edison, the Trustee seeks to recover $84,624.29 plus interest and costs. The complaint against Johnston contains only one count which is pleaded under 11 U.S.C. § 544(b). In this complaint against Johnston, the Trustee seeks to recover $1,316.11 plus interest and costs.

The Trustee pleads Count II of each complaint against Houck and Edison under 11 U.S.C. § 548(a)(2). Therein the Trustee seeks to recover the same amounts from each defendant as in the first Count.

In Count III of the complaint against Houck, the Trustee seeks to recover $5,253.30 under 11 U.S.C. § 544(b), and in Count III of the complaint against Edison, the Trustee seeks to recover $800.00 under 11 U.S.C. § 544(b).

In each count pleaded under § 544(b), the Trustee seeks recovery by reason of a transfer assertedly fraudulent under prevailing state law, in this case the Uniform Fraudulent Transfers Act as adopted in Illinois, 740 ILCS 160/2.

In each Adversary proceeding, the Trustee has separately moved for summary judgment or partial summary judgment. Against Johnston, he seeks summary judgment on the complaint filed in that case under § 544(b). Against Edison, the Trustee has moved for partial summary judgment on Counts I and III of the complaint. Against Houck, the Trustee has moved for summary judgment on all counts.

For reasons stated herein, Plaintiff Trustee's Motion for summary judgment against Defendants Houck, Johnston, and Edison are each allowed, and separate summary judgment orders will be entered.

### Undisputed and Contested Facts

Local Rule 402.M of the Bankruptcy Rules adopted for this District requires the party moving for summary judgment file, among other things, a detailed statement ("402.M statement") of material facts as to which the movant contends there is no genuine issue. Local Bankr.R. 402.M.[1] The 402.M statement "shall consist of short numbered paragraphs, including, within each paragraph, specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph. Failure to submit such a statement constitutes grounds for denial of the motion." *Id.* In each of the three adversaries, the Trustee has filed a 402.M statement that complies with requirements of this Rule. In each case the Trustee filed a 402.M statement that contained numbered paragraphs setting out assertedly uncontested facts. Each paragraph in the Trustee's 402.M statement refers to affidavits, pleadings filed by the defendants, and a criminal indictment of the Debtor which led to a conviction. However, the same cannot be said of the responses by the three defendants.

■■■ The party opposing a summary judgment motion is required by Local Rule

**1. M. Motions for Summary Judgment; Moving Party.**

With each motion for summary judgment filed pursuant to Fed.R.Civ.P. 56 (Fed. R.Bankr.P. 7056), the moving party shall serve and file—
(1) any affidavits and other materials referred to in Fed.R.Civ.P. 56(e);
(2) a supporting memorandum of law; and
(3) a statement of material facts as to which the moving party contends there is no genuine issue and that entitles the moving party to judgment as a matter of law that includes:
(a) a description of the parties; and
(b) all facts supporting venue and jurisdiction in this Court.
The statement of facts referred to in (3) shall consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph. Failure to submit such a statement constitutes grounds for denial of the motion.

**2. N. Motions for Summary Judgment; Opposing Party.**

402.N to respond ("402.N statement") to the movant's 402.M statement, paragraph by paragraph, and to set forth any material facts which would require denial of summary judgment, specifically referring to the record for support of each denial of fact. Local Bankr.R. 402.N.[2] The 402.N statements filed by these defendants do not comply with Local Bankr.R. 402.N. In their respective filings, defendants do not "respon[d] to each numbered paragraph in the moving party's statements" and do not make "specific references to the affidavits, parts of the record, and other supporting materials relied upon." Local Bankr.R. 402.N.(3)(a). Instead, Defendants merely deny that the facts asserted by the Trustee are uncontested. However, this Court "should not be required to guess whether the facts asserted by the opposing parties are in direct conflict or scour the record in search of a party's evidence." *Fotsch v. Eli Lilly and Co.*, 1995 WL 238677 at *1, n. 1 (N.D.Ill. Apr. 20, 1995). Furthermore,

Compliance with Local Rules [402.M and 402.N] is not a mere technicality. The court relies greatly upon the information presented in these statements in separating the facts about which there is a genuine dispute from those about which there is none.

Each party opposing a motion under Fed. R.Civ.P. 56 (Fed.R.Bankr.P. 7056) shall serve and file the following:
(1) any opposing affidavits and other materials referred to in Fed.R.Civ.P. 56(e);
(2) a supporting memorandum of law; and
(3) a concise response to the movant's statement of facts that shall contain:
(a) a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon; and
(b) a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon. All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party.
Local Bankr.R. 402.N.

*American Ins. Co. v. Meyer Steel Drum, Inc.*, 1990 WL 92882 at *7 (N.D.Ill. June 27, 1990).

■ However, Rule 56(e) of the Federal Rules of Civil Procedure and Local Rule 402.M deal with statements of material fact. Statements that embody conclusions, especially legal conclusions, are not the same. *See Maksym v. Loesch*, 937 F.2d 1237, 1243 (7th Cir.1991); and *Davis v. City of Chicago*, 841 F.2d 186, 189 (7th Cir.1988).

### Defendant Houck

The Trustee filed against Houck both a Motion for Summary Judgment and a Request for Admissions ("Request"). To support the allegations made in the Motion for Summary Judgment, the Trustee also filed an Affidavit and submitted various exhibits. Among the exhibits were a copy of a criminal indictment against the Debtors (Exhibit A) and copies of canceled checks (Exhibits D–H).

■ In answer to the Trustee's Motion for Summary Judgment, Houck filed his Response in affidavit form. However, he did not answer each fact that the Trustee designated as uncontested as required by Rule 402.M. Furthermore, Houck did not file an answer to the Request for Admissions. Since Houck failed to respond to the Request for Admissions, the matters set forth in the Request for Admissions are deemed admitted pursuant to Rule 7036.[3]

■ Houck also did not answer the facts set forth by the Trustee in his Rule 402.M statement. As noted above, a non-moving party's failure to respond to the movant's 402.M statement, or his answering in improper form, warrants a court to deem such facts uncontested. Thus, the facts alleged as uncontested by the Trustee in his 402.M statement in support of summary judgment are found to be undisputed. These facts are undisputed both because they are strongly supported by the exhibits the Trustee attached to his Motion[4] and also because of the previously enumerated procedural defects which plague Houck's Response.

The following are material facts deemed uncontested as to defendant Houck:

1. On May 12, 1993, an involuntary petition pursuant to Chapter 7 of the Bankruptcy Code was filed against Michael J. Randy ("Randy"). Request ¶ 1.

2. An order of relief was entered on June 17, 1993, and Martino was appointed trustee. Request ¶ 2. Trustee's Affidavit ¶ 2.

3. As part of an investment scheme, from December 1989 to December 1992, Randy (under the names of Canadian Trade Bank, God Isreal Church, God IsReal Church, God Is Real Church, International Brokers, Cornerstone Investments, Dental Providers, Data Sciences, UGAC Association, God is Church, C.T.B. Holdings, Inc., Canada Trade Bank Ltd., or C.T.B. Data Sciences Intl.) sold to investors ("Creditors") one to three year certificates of deposit (individually a

**3.** Federal Rule of Bankruptcy Procedure 7036 states in part:

(a) **Requests for Admission.** A Party may serve upon any other party a written request for the admission, for purposes of the pending action only, of the truth of any matters within the scope of Rule 26(b)(1) set forth in the request that relate to statements or opinions of fact or of the application of law to fact, including the genuineness of any documents described in the request. Copies of documents shall be served with the request unless they have been or are otherwise furnished or made available for inspection and copying. Without leave of court or written stipulation, requests for admission may not be served before the time specified in Rule 26(d).
Each matter of which an admission is requested shall be separately set forth. *The matter is*

*admitted unless, within 30 days after service of the request, or within such shorter or longer time as the court may allow or as the parties may agree to in writing, subject to Rule 29, the party to whom the request is directed serves upon the party requesting the admission a written objection addressed to the matter, signed by the party or by the party's attorney.*
(Emphasis supplied.)

**4.** The Trustee has attached to all three motions a copy of a criminal indictment under which Randy was convicted of racketeering and mail fraud. Case No. 92 CR 1029. According to the indictment, the charges arose out of the investment scheme that Randy ran. Randy was convicted on January 4, 1994, on all 13 counts, and the Trustee has attached a copy of this indictment and a certified copy of the Jury Verdict. No. 92 CR 1029, Docket Nos. 93, 94.

"CD"; collectively "CD's") paying 10% to 15% interest per annum. Request ¶ 6; Supers. Indict. Count 1 ¶¶ 4–9.

4. As part of his scheme, Randy recruited persons throughout the United States to act as brokers to sell the CD's to Creditors. Randy paid each broker a commission of 10% of the face value of each CD purchased, plus an additional 10% whenever the investor rolled over the investment upon maturity. Request, ¶¶ 8–10; Supers. Indict. Count 1, ¶ 11.

5. Defendant was one of Randy's brokers. Request ¶ 11.[5]

6. On March 24, 1993, the grand jury issued a 22–count indictment against Randy based upon the investment scheme he was running. The indictment alleged mail fraud, money laundering, and racketeering. On November 30, 1993, the grand jury issued a 13–count superseding indictment ("Superseding Indictment") against Randy based upon the same investment scheme. Request ¶¶ 13, 15; Exhibit 1B.[6] He was charged essentially with running a "Ponzi" scheme.

7. On January 4, 1994, the jury convicted Randy on all counts under the Superseding Indictment. Exhibit 1C.[7]

8. Between June 1992 and August 1992, Houck received the following payments from Randy:

| Date | Amount | Check No. |
| --- | --- | --- |
| 06/05/92 | 3,000.00 | 1346 |
| 08/04/92 | 3,000.00 | 1865 |
| 08/07/92 | 132.00 | 1894 |
| TOTAL | 6,132.00 | |

Request, ¶ 20. Exhibits 1D–F.[8]

9. The payments to Houck listed above were made or incurred on or within one year before the date of filing of Randy's petition. Request ¶ 19.

10. At various times in the period more than one year preceding the filing of the bankruptcy, Randy paid additional funds to Houck. Exhibits 1G–N.

| Date | Amount | Check No. |
| --- | --- | --- |
| 08/15/91 | 500.00 | 10971 |
| 08/16/91 | 1,000.00 | 10997 |
| 08/24/91 | 735.55 | 11008 |
| 11/27/91 | 1,000.00 | 000 |
| 12/09/91 | 1,200.00 | 000 |
| 02/14/92 | 717.75 | 1237 |
| 03/14/92 | 100.00 | 206 |
| TOTAL | 5,253.30 | |

11. The Trustee also demonstrates in his 402.M Statement that Randy made the payments with actual intent to hinder, delay, or defraud his creditors. Rule 402.M Statement, ¶ 17. He also established that the Debtor Randy received less than equivalent value in exchange for the payments and that, at the time of the payments, the Debtor was insolvent. Rule 402.M Statement ¶¶ 18, 19.

12. Factual statements set forth in the Discussion below state additional facts found uncontroverted on this record.

### Defendants Johnston and Edison

To each Motion for Summary Judgment against Johnston and Edison, the Trustee attached an Affidavit in which he alleged certain facts. The Affidavit is designated as Exhibit A, supporting his Rule 402.M. statement, and was filed under Fed.R.Bankr.P. 7056. With each Motion for Summary Judgment, the Trustee also filed a Request for Admissions pursuant to Fed.R.Bankr.P. 7026 and 7036. The Trustee's Motion for Summary Judgment (Exhibit D), Affidavit, and Requests for Admissions comply with the

---

5. The Defendant Houck has not admitted selling CD's on behalf of Randy and the Canadian Trade Bank. The Trustee, however, has filed, together with the Motion for Summary Judgment, copies of deposited checks which were drawn on the account of Canadian Trade Bank made payable to Houck. Houck signed and deposited or cashed these checks. He does not deny signing these checks nor does he offer any reason for the payments. In fact, in his Response Houck does not even deny selling CD's for Randy and the Canadian Trade Bank.

6. The Trustee attached to the Motion, his Affidavit and Exhibits. Exhibit 1B, is a copy of the Superseding Indictment against Randy.

7. Exhibit 1C is a copy of the certified verdict signed by all jurors. This Exhibit was filed together with the Motion for Summary Judgment.

8. Exhibits 1D–N are copies of checks which were made out to Houck and drawn on an account of the Canadian Trade Bank. The checks were either cashed or deposited into Houck's bank account, since they were signed by him.

requirements of Rule 402.M and Fed. R.Bankr.P. 7026, 7036, and 7056.

Johnston and Edison each filed a Response in Opposition to Trustee's Motion for Summary Judgment. However, Johnston and Edison's responses did not adhere to Rule 402.N.

Neither Johnston nor Edison in their respective responses answered each separate paragraph in the Trustee's Rule 402.M Statement as required by Local Bankruptcy Rule 402(N)(3)(a). Local Bankruptcy Rule 402(N)(3)(a) requires the party who opposes a motion for summary judgment to file a "concise response" to the movant's statement which "shall contain a response to each numbered paragraph in the moving party's statement". Local Bankr.R. 402(N)(3)(a). Johnston and Edison's non-compliance leads the Court to deem the facts in the Motion as uncontested. *See Schulz v. Serfilco, Ltd.,* 965 F.2d 516, 519 (7th Cir.1992). As earlier noted, a court "should not be required to guess whether the facts asserted by the opposing parties are in direct conflict or scour the record in search of a party's evidence." *Fotsch v. Eli Lilly and Co.,* 1995 WL 238677 at *1, n. 1 (N.D.Ill. Apr. 20, 1995).

Further, neither Response by these Defendants alleged specific facts which supported their contentions that there is no genuine issue of material facts. Fed.R.Bankr.P. 7056(e). Instead, in their respective Responses to the Trustee's Motion, Johnston and Edison each submitted a list of seven issues that they contest:

1. Whether the sale of these investments constituted an investment scheme.

2. Whether the investments being sold were similar to Federal Guaranteed Certificates of Deposit.

3. Whether any sales people received commission on rollover investments.

4. Whether a 10% commission was excessive.

5. Whether each defendant received the payments alleged.

6. Whether the commissions paid were for value in the ordinary course of the Debtor's business.

7. Whether payment of these commissions was made with intent to defraud creditors in the Bankruptcy proceeding.

Edison Response ¶¶ 1–7; Johnston Response ¶¶ 1–7.

These stated issues, which are supposed to show that there are genuine issues of material fact, are freestanding and do not make "specific references to the affidavits, parts of the record, and other supporting material relied upon." Local Rule 402.N. They are mere allegations of factual disputes which do not rest on any material facts specified to be in the record. Johnston and Edison would like the motions to be dismissed on their mere word that there are genuine issues of material fact.

■ Support for the alleged contested facts or issues cannot be found even in the two affidavits submitted in support of the Johnston and Edison' Responses. The affidavits are devoid of any specific facts which might support the above alleged contested facts. The affidavits are also fraught with conclusions. For instance, David Johnston alleges in his affidavit that the transfers here in question "were not paid with intent to hinder, delay and defraud creditors of the bankruptcy." Johnston Affidavit, ¶ 8. The issue in this regard is with respect to *Randy's* intent, not that of any payee, this being an action to recover assertedly fraudulent transfers by Randy. Johnston's allegation is non-specific to any facts that might negate Randy's intent established by the Trustee's filings. The Federal Rules of Civil Procedure and Local Rule 402 contemplate statements of material *fact.* Statements that embody factual or legal conclusions are not accorded any weight in summary judgment proceedings. *See Maksym v. Loesch,* 937 F.2d 1237, 1243 (7th Cir.1991); *Davis v. City of Chicago,* 841 F.2d 186, 189 (7th Cir.1988). Johnston also states in the Affidavit that "my efforts in selling these investments included substantial commitments of time" and that he "received a commission based upon my efforts and in the ordinary course of the Debtor's business". Johnston Affidavit ¶ 5. Once again, assuming for argument's sake the authenticity of his contentions, this is a conclu-

sory statement and not a specific fact which supports Johnston's allegation that there is any issue of material fact. For example, Johnston fails to specify when he did his work (over what period of weeks or months), and the hours of time worked on specific days, and fails to specify the nature of Debtor's business or to show factually why the particular payments to him that the Trustee seeks to recover were made "in the ordinary course" of that business.

> The statements required by Rule 402 are not merely superfluous abstracts of the evidence. Rather, they are intended to alert the court to precisely what factual questions are in dispute and point the court to specific evidence in the record that supports a party's position on each of these questions. They are, in short, roadmaps, and without them the court should not have to proceed further, regardless of how readily it might be able to distill the relevant information on its own.

*Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir.1994).

■ Johnston and Edison also filed Responses to Trustee's Request to Admit. Their Responses to these Requests are also each procedurally flawed. Johnston and Edison each deny the facts requested by the Trustee in paragraphs 2 and 7 through 10, saying they do not have any knowledge of the facts they are requested to admit or deny in these paragraphs. Johnston's Response to Trustee's Request to Admit, ¶¶ 2, 7–10; Edison's Response to Trustee's Request to Admit, ¶¶ 2, 7–19. Defendants cannot deny the requested facts for lack of knowledge unless they state how they have made reasonable inquiry into the matter. Fed. R.Bankr.P. 7036.[9] The answers to these Requests to Admit can be found in the Superseding Indictment under which Randy

was indicted. Johnston and Edison's claims of ignorance of facts as to Randy's activities pleaded in the Superseding Indictment, and established by Randy's conviction, do not create genuine issues of material fact.

■ Since all the pleadings and affidavits filed by Johnston and Edison are procedurally faulty or substantively inadequate, the material facts found uncontested as to Johnston and Edison are those set forth in the Trustee's Rule 402.M Statement and Requests to Admit. While the deficiencies described above are more than enough to allow this Court to adopt the facts thus asserted by the Trustee, it is important to note that the Trustee's allegations as to Randy were established by proof of his conviction in a criminal trial on an indictment setting forth those very matters.[10]

Furthermore, before the Trustee filed his pending motions, Johnston and Edison, together with the Trustee, filed a Joint Preliminary Pretrial Statement ("Pretrial Statement") in which the defendants agreed with the Trustee regarding various material facts that they now seek to deny. Thus, the factual assertions of the Trustee are well supported in different ways, while those of the defendants are inadequate, as earlier discussed.

The uncontested facts as to defendants Johnston and Edison are the same and are based on the same record.[11]

The following are those material undisputed facts:

1. On May 12, 1993, an involuntary petition pursuant to Chapter 7 of the Bankruptcy Code was filed against Michael J. Randy ("Randy"). Pretrial Statement IV. A. 1.

2. An order of relief was entered on June 17, 1993, and Philip V. Martino was appointed Trustee. Motion for S.J. ¶ 5.

9. Federal Bankruptcy Rule 7036 incorporates Fed.R.Civ.P. 36, which deals with Requests for Admission. The Fed.R.Civ.P. 36 states in part:
> An answering party may not give lack of information or knowledge as a reason for failure to admit or deny unless the party states that the party has made reasonable inquiry and that the information known or readily obtainable by the party is insufficient to enable the party to admit or deny.

10. See paragraph 6 of the "Uncontested facts as to Defendant Houck" and note 4. *Supra.*

11. All transfers to Edison Worldwide Capital were made by delivery of the funds to Johnston. Also, Johnston answered in affidavit form the Trustee's Motion for Summary Judgment against Edison.

3. As part of an investment scheme, from December 1989 to December 1992, Randy (under the names of Canadian Trade Bank, God IsReal Church, God Is Real Church, International Brokers, Cornerstone Investments, Dental Providers, Data Sciences, UGAC Association, God is Church, C.T.B. Holdings, Inc., Canada Trade Bank Ltd., or C.T.B. Data Sciences Intl.) sold to investors ("Creditors") one to three year certificates of deposit (individually a "CD"; collectively "CD's") paying 10% to 15% interest per annum. Motion for S.J. ¶ 6; Supers. Indict. Count 1 ¶¶ 4–9.[12]

4. As part of his scheme, Randy recruited persons throughout the United States to act as brokers to sell the CD's to Creditors. Randy paid each broker a commission of 10% of the face value of each CD purchased, plus an additional 10% whenever the investor rolled over the investment upon maturity. Motion for S.J. ¶ 8; Supers. Indict. Count 1, ¶ 11.

5. Defendants Edison and Johnston were Randy's brokers. Motion ¶ 11.[13]

6. On March 24, 1993, the grand jury issued a 22–count indictment against Randy based upon the investment scheme he was running. The indictment alleged mail fraud, money laundering, and racketeering. On November 30, 1993, the grand jury issued a 13–count superseding indictment ("Superseding Indictment") against Randy based upon the same investment scheme. Request ¶¶ 13, 15; Exhibit 1B.[14] He was charged essentially with running a "Ponzi" scheme.

7. On January 4, 1994, the jury convicted Randy on all counts under the Superseding Indictment. Exhibit 1C.[15]

8. On May 17, 1992, Defendant Edison received $800.00 from Randy (Check no. 1087).[16]

9. This payment to Edison was made or incurred on or within one year before the date of filing of the petition. Request ¶ 19.

10. Also at various times in the period less than one year preceding the filing of the bankruptcy, Randy transferred the following funds to Edison:

| Date | Amount | Check No. |
| --- | --- | --- |
| 05/26/92 | 1,000.00 | 1293 |
| 07/02/92 | 500.00 | 1519 |
| 07/22/92 | 2,500.00 | 1654 |
| 08/04/92 | 135.00 | 1853 |
| 08/04/92 | 200.00 | 1854 |
| 08/05/92 | 1,000.00 | 1864 |
| 08/20/92 | 11,516.99 | 1138 |
| 09/28/92 | 7,000.00 | Wire Transfer |
| 10/02/92 | 30,000.00 | 1110 |
| 10/19/92 | 14,900.00 | T36 |
| 11/09/92 | 9,921.00 | 1042 |
| 11/19/92 | 5,951.00 | 1109 |
| TOTAL | 84,624.29 | |

Request ¶ 27.

11. Defendant Johnston received the following payment from Randy on or within one year before the petition was filed:

| Date | Amount | Check No. |
| --- | --- | --- |
| 04/09/92 | 1,316.11 | 1028 |

12. Factual statements set forth in the Discussion below state additional facts found uncontroverted on this record.

---

12. Similar to his filings in the adversary case against Houck, the Trustee has attached to the Motion his Affidavit and Exhibits. Exhibit 1B is a copy of the Superseding Indictment under which Randy was convicted.

13. Johnston denies in his Answer to Requests on behalf of himself and Edison that he was a "broker" for Randy's investment scheme. However, in his Affidavit, Johnston stated that he sold the Canadian Trade Bank CD's. Johnston Affidavit ¶ 2. Johnston also stated that he received "commissions" for the services he performed. *Id.* at ¶ 6.

14. The Trustee has attached to the Motion for Summary Judgment a copy of the Superseding

Indictment against Randy. It was designated Exhibit B by the Trustee.

15. Exhibit 1C is a copy of the certified verdict signed by all jurors. This Exhibit was filed together with the Motion for Summary Judgment.

16. The Trustee has not filed copies of the checks with which Randy allegedly paid Edison and Johnston. Defendants, however, have admitted to the transfers in the Pretrial Statement the parties jointly submitted to the Court. The procedural deficiencies in Edison and Johnston's Answers to the Trustee's Request for Admissions also lead to the transfers being uncontested.

### Standards for Summary Judgment

Under Fed.R.Civ.P. 56(c), summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c), 28 U.S.C. Federal Rule of Civil Procedure 56 is applicable as adopted for bankruptcy proceedings through Fed.R.Bankr.P. 7056. *See generally Trautvetter v. Quick,* 916 F.2d 1140, 1147 (7th Cir.1990). In 1986, the United States Supreme Court, through its decisions in three cases, encouraged the use of summary judgment as a way to dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986).

Summary judgment is granted to avoid unnecessary trials when there is no genuine issue of material fact in dispute. *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552; *Matsushita,* 475 U.S. at 585–86, 106 S.Ct. at 1355–56. A court may render summary judgment upon the whole case or only a portion thereof. Fed.R.Civ.P. 56(e). Partial summary judgment is available where it disposes of at least one count of the complaint in its entirety. *Commonwealth Ins. Co. v. O. Henry Tent & Awning Co.,* 266 F.2d 200, 201 (7th Cir.1959); *Quintana v. Byrd,* 669 F.Supp. 849, 850 (N.D.Ill.1987).

The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists and that judgment should be granted in its favor as a matter of law. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53. The movant must inform the court of the basis for its motion and identify those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Id.* There is no genuine issue for trial only if the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party.

*Matsushita,* 475 U.S. at 585–87, 106 S.Ct. at 1355–56; *Liberty Lobby, Inc.,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11. The party opposing the motion may not rest upon mere allegations or denials in its pleadings. Rather, its response must set forth in required filings specific facts showing that there is a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356; *Randle v. LaSalle Telecommunications, Inc.,* 876 F.2d 563, 567 (7th Cir.1989); *Patrick v. Jasper County,* 901 F.2d 561, 564–66 (7th Cir.1990).

On summary judgment motions, inferences to be drawn from underlying facts must be viewed in the light most favorable to parties opposing the motion. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14; *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356; *Billups v. Methodist Hosp. of Chicago,* 922 F.2d 1300, 1302 (7th Cir.1991); *Karazanos v. Navistar Int'l Transp. Corp.,* 948 F.2d 332, 335 (7th Cir.1991). However, the existence of a material factual dispute is sufficient only if the disputed fact is determinative of the outcome under applicable law. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Donald v. Polk County,* 836 F.2d at 379; *Wallace v. Greer,* 821 F.2d 1274, 1276 (7th Cir.1987).

In deciding a motion for summary judgment, the court should not "weigh the evidence." *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510–11; *Illinois Bell Telephone Co. v. Haines and Company, Inc.,* 905 F.2d 1081, 1087 (7th Cir.1990). However, "if evidence opposing summary judgment is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2511. *Trautvetter v. Quick,* 916 F.2d at 1147. When the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial and summary judgment should be granted. *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356.

### Jurisdiction

All three defendants deny that venue is proper in this Court and that this Court has

jurisdiction over this dispute. However, venue is proper under 28 U.S.C. § 1409. This matter is before the Court pursuant to 28 U.S.C. § 157 and is referred to bankruptcy judges in this District under Local General Rule 2.33(A) of the Northern District of Illinois. The Court has subject matter jurisdiction under 28 U.S.C. § 1334(b). Core jurisdiction lies under U.S.C. § 157(b)(2)(F).

### Discussion

The Trustee's case seeks under §§ 544 and 548 of the Code to recover transfers made by Debtor. These transfers were commission payments to Defendants, who all acted as brokers and were paid for their efforts in coopting investors into Debtor's scheme.

The Debtor was running a classic Ponzi scheme. The facts demonstrated by the Trustee and the conviction show that Randy never intended to run a legitimate business. He used the funds he received from later investors to pay earlier investors their "profits." [17] The Supreme Court has held that investors in a Ponzi scheme have a right to keep the principal amount of their investment, but must return the profits they were paid out of the scheme. *See Cunningham v. Brown,* 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924) (investors in Ponzi scheme have an equitable right to receive their original investments); *Eby v. Ashley,* 1 F.2d 971, 973 (4th Cir.1924), *cert. denied,* 266 U.S. 631, 45 S.Ct. 197, 69 L.Ed. 478 (1925) (amounts paid to investors in a Ponzi scheme in excess of principal amounts deemed fraudulent).

Following these Supreme Court holdings, bankruptcy courts have denied summary judgment on motions which sought to recover the principal paid to investors in a Ponzi scheme. These courts have found that there was a genuine issue of fact as to whether the transferees gave value to the debtor's estate and whether they took the money in good faith. *Rafoth v. Bailey (In re Baker & Getty Financial Services, Inc.,* 88 B.R. 792, 795 (Bankr.N.D.Ohio 1988). *Merrill v. Abbott (In re Independent Clearing House),* 77 B.R. 843, 857 (D.Utah 1987); *Rider & Family v. Wyle (In re United Energy Corp.),* 102 B.R. 757 (9th Cir. BAP 1989), *aff'd. In re United Energy Corp.,* 944 F.2d 589 (9th Cir.1991); *In re Taubman,* 160 B.R. 964, 980 (Bankr. S.D.Ohio 1993); *Plotkin v. Pomona Valley Motors (In re Cohen),* 182 B.R. 46, 47 (Bankr.C.D. Cal. 1994). However, where bankruptcy trustees were able to show that debtors were running Ponzi schemes and that investors were paid profits out of the schemes, courts have granted the trustees' summary judgment motions to avoid profit payments under § 548 and § 544 of the Code. *In re Independent Clearing House,* 77 B.R. 843, 859–60 (Bankr.Utah 1987); *Rafoth,* 88 B.R. at 796; *Emerson v. Maples (In re Mark Benskin),* 161 B.R. 644, 649–50 (Bankr.W.D.Tenn.1993); *In re Taubman,* 160 B.R. at 980; *Jobin v. Waukau (In re M & L Business Machine Co., Inc.),* 166 B.R. 723, 724 (Bankr.D.Col.1993).

Most of these decisions reason, as a matter of law, that the investor/defendants in these fraudulent transfer actions should not be allowed to keep payments in excess of their original investments since they would be profiting at the expense of those investors who enter the scheme late and receive nothing. *In re Independent Clearing House* at 870; *In re Taubman* at 980. The fact that

---

**17.** A "Ponzi" scheme is a term generally used to describe an investment scheme which is not really supported by any underlying business venture. The investors are paid profits from the principal sums paid in by newly attracted investors. Usually those who invest in the scheme are promised large returns on their principal investments. The initial investors are indeed paid the sizable promised returns. This attracts additional investors. More and more investors need to be attracted into the scheme so that the growing number of investors on top can get paid. The person who runs this scheme typically uses some of the money invested for personal use. Usually this pyramid collapses and most investors not only do

not get paid their profits, but also lose their principal investments. *See Cunningham v. Brown,* 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924); *Boyle v. Gray,* 28 F.2d 7 (1st Cir.1928), *cert. denied,* 278 U.S. 653, 49 S.Ct. 178, 73 L.Ed. 563 (1929); *United States v. Rasheed,* 663 F.2d 843 (9th Cir.1981), *cert. denied,* 454 U.S. 1157, 102 S.Ct. 1031, 71 L.Ed.2d 315 (1982); *In re Diversified Brokers Company, Inc.,* 487 F.2d 355 (8th Cir.1973); *Conroy v. Shott,* 363 F.2d 90 (6th Cir.1966); *In re Moore,* 39 B.R. 571 (Bankr. M.D.Fla.1984); *Merrill v. Abbott (In re Independent Clearing House),* 1994 Bankr. Lexis 29 (Bankr.N.D.Ill.1994) (Schmetterer, J.).

such investors got into the scheme early enough to make a profit should not entitle them to a reward at the expense of other investors who entered the scheme later. *Id.*

■ In this case, the Trustee seeks to retrieve commissions paid to three defendant brokers for their efforts in coopting new investors into a Ponzi scheme. These brokers were also paid commissions for inducing persons who had already invested in the scheme to keep their principal investments in place so that the Ponzi scheme would not collapse. The underlying reasoning that courts have used to find that profits paid in a Ponzi scheme to innocent investors are fraudulent transfers applies equally well to commissions paid to brokers who promoted or aided the investment scheme, whether or not they had any culpable intent. Therefore, as a matter of law, when brokers are paid commissions for their efforts in promoting a Ponzi scheme, these commissions are fraudulent transfers under §§ 548 and 544 of the Code. In this case, the Defendants have not shown that they invested into Randy's scheme. Therefore, all commission payments to them are analogous to the "profits" found actionable in *Clearing House* and *Taubman.*

## SECTION 548 ISSUES

### 1. 548(a)(1)

■ In the first count of his complaint against Houck and Edison, the Trustee seeks to recover funds that were paid to Defendants by Debtor under § 548(a)(1) of the Bankruptcy Code.[18] To prove that a transaction is fraudulent under § 548(a)(1), the Trustee must show that the transfers actual-

ly took place and that the debtor (not the payee) had "actual intent to hinder, delay or defraud" his creditors. Normally, courts have held that, if the debtor is running a Ponzi scheme and he advances monies to the investors in excess of the principal originally paid into the scheme, the debtor possesses actual intent to hinder, delay, or defraud. *Taubman,* 160 B.R. at 982; *Agricultural Research and Technology Group,* 916 F.2d at 535; *Rafoth v. Bailey,* 88 B.R. at 799; *Benskin,* 161 B.R. at 649. The reason why courts have reached this result is set out in *Independent Clearing House:*

> A Ponzi scheme cannot work forever. The investor pool is a limited resource and will eventually run dry. The perpetrator must know that the scheme will eventually collapse as a result of the inability to attract new investors ... He must know all along, from the very nature of his activities, that investors at the end of the line will lose their money. Knowledge to a substantial certainty constitutes intent in the eyes of the law. Cf. Restatement (Second) of Torts, Sec. 8A (1963 & 1964), and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them.

77 B.R. at 860.

*Cf. Coleman Am. Moving Servs., Inc., v. First Nat'l Bank & Trust Co. (In re American Properties, Inc.),* 14 B.R. 637, 643 (Bankr.D.Kan.1981) (intentionally carrying out a transaction with full knowledge that its effect will be detrimental to creditors is sufficient for actual intent to hinder, delay, or defraud within the means of § 548(a)(1)). *See Conroy v. Shott,* 363 F.2d 90, 91–92 (6th Cir.), *cert. denied,* 385 U.S. 969, 87 S.Ct. 501,

---

18. Section 548 of the Code states:

**11 U.S.C. § 548. Fraudulent Transfers and Obligations.**

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, or after the date that such transfer was made or such obligation was incurred, indebted; or

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(1) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(ii) was engaged in business or transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(iii) intended to incur, or believed that the debtor would incur, debt that would be beyond the debtor's ability to pay such debts matured.

17 L.Ed.2d 433 (1966) (quoting with approval from the opinion of the district court which granted the trustee's motion for summary judgment and concluded that "the question of intent to defraud is not debatable" given the fact that the debtor was carrying on a Ponzi scheme).

Even though the opinions cited above decided whether profits paid to investors in a Ponzi scheme were fraudulent transfers, their reasoning also applies to commissions paid to brokers. Since Randy's intent is relevant under § 548, where his intent to run a Ponzi scheme is proved, it can certainly be inferred that he had "actual intent to hinder, delay, or defraud" when he paid his brokers commissions for their efforts to market Debtor's Ponzi scheme. Randy necessarily knew all along that most investors, certainly the latest among them, would lose their money if they invested in his scheme. Without a doubt on this record, Randy had actual intent to defraud his creditors when he paid brokers from investors' funds. He paid commissions to brokers so that more investors would be enticed into the investment scheme and be defrauded. Similarly, the brokers' efforts to convince investors to roll over their principal investments only perpetuated the Ponzi scheme, whether or not they knew the extent of the scheme.

That the Debtor Randy intended to defraud his investors was established by the jury verdict against him in the criminal proceeding. It was held in *Benskin* that the Trustee established that the debtor had actual intent to "hinder, delay and defraud" for purposes of § 548(a)(1) where the debtor had pleaded guilty to "related criminal charges." 161 B.R. at 648. In *Benskin*, as in this case, the debtor was running a Ponzi scheme and was indicted and convicted as a result of defrauding the investors in this investment scheme. The court there gave preclusive effect as a factual finding to the debtor's guilty plea in a criminal proceeding. *Id.* at 646. To find whether the debtor had "actual intent" under § 548(a)(1), the court looked to the indictment to which the debtor pleaded guilty. The indictment there alleged that the debtor ran an investment scheme to defraud creditors, including a scheme to control the

investors' funds and to use those funds for the debtor's benefit. *Id.* The court in *Benskin* found that, because of the convictions on that indictment, the Trustee had "clearly and convincingly" established that the debtor had "actual intent" for the purposes of § 548.

Similarly, the debtor in this case was indicted and convicted by a jury on a variety of criminal charges which were all related to his investment scheme. That conviction on language charged by the indictment established that Randy had "actual intent" under § 548(a)(1).

The Superseding Indictment under which Randy was convicted clearly established that he intended to defraud his creditors. He induced people to invest in CD's issued by the Canadian Trade Bank by making a variety of misrepresentations about the Canadian Trade Bank and its investment portfolio. Superseding Indict. Count I, ¶¶ 15–19. Randy claimed that the Canadian Trade Bank maintained "100% liquidity," that it used its assets to purchase the bonds of governments and corporations, that it insured all of its deposits, and that it was audited five times a year. *Id.* He also claimed that the Canadian Trade Bank had a strong investment portfolio and that all funds were held in major world money centers and with world class banks and brokerages. *Id.* Despite his claims to investors, Randy **well knew** that the Canadian Trade Bank did not have a strong investment portfolio and none of its assets were used to purchase the bonds of governments or major corporations." Superseding Indict. Count I, ¶ 16(a) (emphasis added). Furthermore, the assets of the Canadian Trade Bank were not placed in major banks and brokerage houses, but were placed in highly speculative investments and diverted to Randy's personal use. Superseding Indict. Count I, ¶ 16(b). Randy did not make profit payments on the CD's to investors from earnings of the Canadian Trade Bank, but he made those payments from funds he obtained from new investors. Superseding Indict. Count I, ¶ 16(c). Randy paid investors their promised profits with principal contributions from new investors because he diverted much of the principal sums paid by investors for his personal use. Superseding

Indictment, Count I, ¶ 19. Randy necessarily knew that most investors would not get paid back their principal because he had taken about $5 million from the investment funds and used it to buy artwork, a personal luxury residence, and also to finance companies that he and his wife owned. *Id.*

In response to the Trustee's motion for summary judgment, Defendants simply deny these facts, asserting that they have no knowledge of them. Nevertheless, these facts were litigated previously in Randy's criminal trial, and Randy was convicted under the Superseding Indictment on all counts in a criminal proceeding.

 Collateral estoppel prevents the relitigation of issues as to Randy's intent already decided in Randy's criminal case. It is well established that a criminal conviction may conclusively determine an issue in subsequent civil litigation. *See Nathan v. Tenna Corp.*, 560 F.2d 761, 763–64 (7th Cir.1977); *In re Raiford*, 695 F.2d 521, 523 (11th Cir. 1983); *In re Discount Merchandise, Inc.*, 1994 WL 18629 at *21. (Bankr.N.D.Ill.1994) (Schmetterer, J.). The charges in the Superseding Indictment were litigated, and the bare denials by Defendants about Randy's intent is not enough to create a genuine issue of fact as to that intent.

Therefore, there is no genuine issue of material fact on this issue. The Debtor in this case possessed "actual intent to hinder, delay or defraud" his creditors when he paid Defendants their commissions, all within the meaning of § 548(a).

### 2. 548(a)(2)

In Count II of his complaint against Houck and Edison, the Trustee pleads that the commission payments are also fraudulent under § 548(a)(2)[19] of the Code.

 Generally, to succeed in his action under § 548(a)(2), the Trustee must show that (1) a transfer was made, (2) the transferred property belonged to the debtor, (3) the transfer was made within one year prior to the filing of the petition, (4) the transfer was made for less than equivalent value, and (5) at a time the debtor was insolvent or was made insolvent by the transfer. *McKeever v. McClandon (In re McKeever)*, 132 B.R. 996, 1008 (Bankr.N.D.Ill.1991) (Katz, J.).

In this case, it has been deemed undisputed that Randy paid Houck and Edison commissions. The relevant payments were made within a year prior to the bankruptcy filing and were made out of the debtor's estate. The remaining issue under § 548(a)(2) is whether Randy received "less than reasonably equivalent value" for commissions he paid his brokers and whether Randy was or became insolvent at the time of transfer.

 Defendants argue that their sales efforts constituted the value they gave to the Debtor's estate for the commissions they were paid. To determine whether Debtor received value for the transfer, the Court needs to first assess the bargain that Debtor made and which gave rise to Debtor's liability to his creditors. *See Independent Clearing House Co.* 77 B.R. at 857 (whether a debtor in a Ponzi scheme owes profits to investors depends on whether or not the defendant had an enforceable contract); *Dicello v. Jenkins (In re International Loan Network, Inc.)*, 160 B.R. 1, 12 (Bankr.D.C. 1993) (whether the investors in a Ponzi scheme have a valid claim against the debtor for the principal they have invested depends on whether they have an enforceable contract with the debtor or otherwise have a right of restitution). Debtor's liability for the commissions arose under whatever agreement he made with each of the Defendants. Therefore, whether Debtor was really indebted to

---

**19.** Section 548(a)(2) of the Code states that a Trustee may avoid a transfer if the debtor:

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
 (B)(1) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or
(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.
11 U.S.C. § 548(a)(2).

Defendants depends on whether or not Defendants had a valid, enforceable right under their agreement with Debtor to receive the commissions.

Several courts have faced the question of whether a debtor who runs a Ponzi scheme receives reasonable value under § 548(a)(2) for profits he receives under the investment contract. *In re Taubman,* 160 B.R. at 982; *In re Independent Clearing House Co.,* 77 B.R. at 843; *In re Agricultural Research and Technology Group,* 916 F.2d at 535, *Rafoth,* 98 Bankr. at 308; *Benskin,* 161 B.R. at 649. These courts have decided that the contract that underlies the transaction is illegal, and therefore no value could have been given by the transferee to the debtor for the transfer. For reasons that follow, this Court concludes that this argument applies even more forcefully to brokers who have received commissions for helping perpetrate the Ponzi scheme.

■ Generally, courts will not enforce an illegal contract based upon the "elementary principle that one who has himself participated in a violation of law cannot be permitted to assert in a court of justice any right founded upon, growing upon, or out of the illegal transaction." *Gibbs & Sterrett Mfg. Co. v. Brucker,* 111 U.S. 597, 601, 4 S.Ct. 572, 574, 28 L.Ed. 534 (1884).

It is generally held that, if a party seeking enforcement of an illegal contract is innocent of any wrongdoing, the rationale for refusing to enforce the bargain does not apply. *See* J Clalmari & J. Perillo, *The Law of Contracts,* § 22–4 at 782–83 (2d ed.1977); *Restatement of Contracts,* § 599 (1932). However, despite such innocence, in some types of cases "the interest of the public, rather than the equitable standing of individual parties, is of determining importance." *Independent Clearing House,* 77 B.R. at 858 (quoting from 14 S. Williston & W. Jaeger, *A Treatise on the Law of Contracts* § 1630A at 22–23 (3d ed.1972)). The court in *Independent Clearing House* found that to allow an investor to enforce his contract for profits in excess of the principal would only further the debtor's Ponzi scheme at the expense of the investors. *Independent Clearing House,* 77 B.R. at 858. Similarly, if this Court were to enforce the

contract for sales services between the Defendants and the Debtor, it would only help finish what Randy long ago started, which is, defrauding many innocent investors.

The holding in *Dicello v. Jenkins (In re International Loan Network)* is useful regarding commissions. 160 B.R. 1 (Bankr. D.D.C.1993). In *International Loan Network,* as here, the issue was whether reasonably equivalent value was given where investors gave a debtor their efforts to get others to join the investment scheme. *Id.* at 12. In *International Loan Network,* the investors "talked up" the investment scheme so as to increase their return but conceded in oral argument that there was no express contract between the debtor and the investors for these selling efforts. However, the opinion reasoned that, "even if a contract existed here, the services conferred no value" and, in fact, enforcing a contract for selling efforts in a Ponzi scheme would only "exacerbate the harm to creditors by increasing the amount of claims while diminishing the debtor's estate." *Id.* at 16. Thus, the court in *International Loan Network* stated that, since the investors' solicitation efforts were not of any value to the bankruptcy estate, it followed that defendants could not have given "reasonably equivalent value" for the money they received from the debtor. *Id.* As in *International Loan Network,* enforcing any agreements between Randy and these Defendants would only exacerbate the harm to the debtor's creditors. Any contracts of the Defendants would be unenforceable, and no value was or could legally be given pursuant thereto to the Debtor or the Debtor's bankruptcy estate.

■ The Trustee also asserts that the Debtor was insolvent at the time of the transfer, as required by § 548(a)(2). Having been convicted of a Ponzi scheme, Randy was insolvent from its inception as a matter of law. *See Cunningham v. Brown,* 265 U.S. at 8, 44 S.Ct. at 425 (Ponzi scheme debtor was always insolvent and became more so each day the business succeeded); *Guy v. Abdulla,* 57 F.R.D. 14, 17 (N.D.Ohio 1972) (possible to establish that Ponzi scheme was insolvent from its very inception). Thus, the Trustee

has also thereby fulfilled the insolvency requirement of § 548(a)(2)(B)(I).

### 3. The shelter of § 548(c).

■ Even where a transfer meets requirements of § 548(a)(1) and (2), § 548(c) of the Code[20] can be used to shelter payments from the Trustee's avoiding power. Such payments can be sheltered to the extent that defendants gave good value to the debtor's estate for the commissions and took the payments in good faith. *In re Telesphere Communications, Inc.,* 179 B.R. 544, 557 (Bankr. N.D.Ill.1994) (Wedoff, J.); *Butler v. Lejcar (In re Butler),* 171 B.R. 321, 327–29 (Bankr. N.D.Ill.1994) (Schmetterer, J.). The issues in this regard are whether the Defendants gave good value to the Debtor for the commissions they took for their selling efforts as part of a Ponzi scheme and whether they took their commissions in good faith.

■ Courts have denied use of the § 548(c) shelter to transferees who were trying to shelter profits paid by the debtor from a Ponzi scheme because they did not give any value for the transfer. *Independent Clearing House Co.,* 77 B.R. at 861 (holding that investors in a Ponzi scheme did not give "value" within the meaning of § 548 for profits they received from the debtor); *International Loan Network, Inc.,* 160 B.R. at 16 (since investors in a Ponzi scheme who received transfers in excess of their principal investments were not able to establish value for purposes of § 548(a)(2), they also could not establish value under § 548(c)). *Taubman,* 160 B.R. at 986 ("the extent to which a defendant gave value under § 548(c) is the flip side of the question of whether a defendant gave reasonably equivalent value under § 548(a)(2)"). These courts have reasoned that, if the defendants were not able to give "reasonably equivalent value" for the purposes of § 548(a)(2), they would also not be able to use the § 548(c) shelter which requires that the transferees give "value" to

the debtor to the extent that they want the transfer to be shielded from the Trustee's avoiding power. *Id.* On that reasoning, the § 548(c) shelter is not available to Defendants in this case since it has already been found that Defendants gave no "value" to the Debtor for purposes of finding "reasonable value" under § 548(a)(2). Therefore, Defendants could not have given any "value" for their commissions so as to use the § 548(c) shelter.

The holding in *Wilson v. RHS & Associates (In re Blazo Corporation),* 1994 WL 456881 (Bankr.N.D.Ohio 1994), is on point. In *Blazo,* the court found that § 548(c) was not an available defense to participants in a Ponzi scheme who were seeking to shelter their commissions earned for perpetuating the scheme. The court denied defendants the § 548(c) defense because they were "asserting a claim for their efforts and expenses in furtherance of an illegal contract ..." and "[t]he defendants worked, by their own admission, assiduously and effectively to advance the debtor's nefarious scheme." *Id.* Therefore, that court concluded that they could not use § 548(c) to shelter their commissions because they had not given value for the transfers. *Id.*

Since no value was or could be legally given, it is not necessary to reach the question of good faith under § 548(c). Since these Defendants could not give any "value" to the estate for promoting a Ponzi scheme, they cannot use the § 548(c) shelter. It is possible that others providing ordinary services to Randy not involving the Ponzi scheme, especially employees of the Debtor, might have deserved to be paid for their services because they acted in good faith and gave value to the debtor. Not so with these Defendants who received a form of profit from their work selling the Ponzi scheme.

Thus, commissions paid to these Defendants out of a Ponzi scheme were fraudulent

**20.** Section 548(c) of the Code states:
(c) Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest

transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.
11 *U.S.C.* § 548(c).

transfers under § 548(a)(1) and § 548(a)(2) and cannot be sheltered under § 548(c).

## THE UNIFORM FRAUDULENT TRANSFERS ACT

In Count I against Johnston and Count III in the respective complaints against Edison and Houck, the Trustee alleges that Randy made fraudulent transfers to defendants under the Uniform Fraudulent Transfer Act as adopted in Illinois ("UFTA").[21] 740 ILCS 160/5. Since the UFTA is state law, the Trustee may reach its benefits in a federal bankruptcy case by using his avoiding powers under § 544(b) of the Code. The provisions of the UFTA essentially parallel § 548 of the Code. The only significant difference is that, under UFTA, the Trustee can recover property that was fraudulently transferred out of the estate more than one year before the petition date. Under § 548, the Trustee may only avoid a transfer that is "within one year before the date of the filing of the petition." 11 U.S.C. § 548(a). Causes of action for fraudulent conveyances can be brought under the UFTA within four years after the transfer was made. 740 ILCS 160/10(a). Therefore, the Trustee must rely on Illinois law if he is to recover commission payments that were made earlier than one year before the bankruptcy petition was filed.

Since § 548 of the Bankruptcy Code and §§ 5 and 6(a) of UFTA are analogous, the findings regarding § 548(a)(1) and § 548(a)(2) apply identically to the requirements of UFTA as adopted in Illinois. *See* 4 *Collier on Bankruptcy*, ¶ 548.01 (15th

Ed.1992); *United Energy Corp.*, 944 F.2d at 594. Like § 548, the UFTA permits two theories of recovery. One allows the Trustee to recover a transfer that was made by the debtor "with actual intent to hinder, delay, or defraud any creditor of the debtor." 740 ILCS 160/5(a)(1). The other theory allows recovery if the debtor did not receive "reasonably equivalent value" for the transfer and was left insolvent or with unreasonably small capital. 740 ILCS 160/5(a)(2). These elements were examined hereinabove, and no genuine issue of material fact was found as to any of them. Therefore, the Trustee has also shown that there is no genuine issue of fact as to its claim under the IUFTA, and his motion for summary judgment is granted as to the payments that were made within four years prior to the filing of this Adversary proceeding.

## JOHNSTON'S DISGORGEMENT DEFENSE

In his affidavit, Defendant Johnston shows that he paid an $8,000.00 "administrative fine" to the Florida Department of Bank and Finance, Division of Securities. Johnston Affidavit ¶ 9. Johnston asserts the fine payment as a defense in his affidavit and argues in effect that he has thereby disgorged himself of the fraudulent transfers. While this defense is novel, it is insufficient to shield commission payments to Johnston from the Trustee's avoiding power.

The question in this regard is whether Defendant Johnston should in effect be given credit here because he paid an administrative fine for the same acts that gave rise to the

---

21. The UFTA states in part:
§ 5.(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
(1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor;
(A) was engaged or about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

§ 6.(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

fraudulent transfers to him. In other words, Johnston claims that he need not return the commissions because he disgorged himself of those payments by paying a fine to the Florida Department of Bank and Finance. While other courts were not found to have considered this same issue, the answer lies with the character and purpose of securities laws and fraudulent conveyance law under the Bankruptcy Code and also under UFTA.

A disgorgement order for a securities law violation may serve the purpose of punishment and deterrence. *See, e.g., S.E.C. v. First City Financial Corp.,* 890 F.2d 1215, 1230 (D.C.Cir.1989); *Rowe v. Maremont Corp.,* 850 F.2d 1226, 1241 (7th Cir.1988); *S.E.C. v. Blatt,* 583 F.2d 1325, 1335 (5th Cir.1978); *S.E.C. v. Manor Nursing Centers,* 458 F.2d 1082, 1104 (2d Cir.1972). However, even if a fine is partly restitutionary in character, it may still be a fine or penalty as defined by the Code. *See Securities and Exchange Commission v. Telsey (In re Steven Telsey),* 144 B.R. 563, 564 (Bankr. S.D.Fla.1992) (holding that the deterrence purpose of the disgorgement order sufficiently penal to characterize the resulting debt as a "fine, penalty, or forfeiture" within the meaning of § 523(a)(7)).

The setting aside of fraudulent transfers has an entirely different purpose. The purpose of fraudulent conveyance law, be it § 548 of the Code or the UFTA, is to protect a debtor's unsecured creditors from unfair reductions in the debtor's estate to which creditors usually look for security. As a result of this protection, credit and financial transactions are less risky and more efficient from a societal point of view because creditors have lower monitoring costs. *See* Epstein, Nickles & White, *Bankruptcy,* Vol. 2, § 6–46. Administrative fines for securities law violations are different from court orders directing return of fraudulent conveyances under Code § 548; one cannot be offset against the other. Johnston was fined by the Florida Department of Bank and Finance for selling phony securities to the public. He cannot offset that fine amount against an order of this Court to return to the Debtor's estate the commissions he received. The fraudulent conveyances set aside and recovered will be distributed to the defrauded creditors. While the purpose of the fine was to deter Johnston from selling phony securities, the purpose of fraudulent conveyance law is restitutionary. The state's fine of Johnston did not return anything to the bankruptcy estate for Randy's creditors, so he gets no credit for it here.

### CONCLUSION

For reasons stated herein, Trustee's separate Motions for Summary Judgment against Defendants Houck, Johnston, and Edison are each allowed, and the cases will be set for entry of separate judgment orders.