In re 21st CENTURY SATELLITE
COMMUNICATIONS, INC.,
Debtor.

Glenn A. Liberatore, individually and
as Trustee of the Glenn A. Libera-
tore Family Living Trust,

v.

21st Century Satellite Communications,
Inc., Robert S. Byrch, Spencer G. Tyr-
rell, Ranchod K. Khant, Donald Ire-
land, Gabe Panepinto, Richard D.
Morris and Morris Financial Services,
Inc., a Florida Corporation, Defen-
dants,

21st Century Satellite Communications,
Inc., Counter-plaintiff,

v.

Glenn A. Liberatore, et al.,
Counter-defendants.

Bankruptcy No. 01–08592–8P1.
Adversary No. 01–335.

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

May 15, 2002.

Craig E. Rothburd, Robert K. Eddy & Assoc., P.A., Tampa, FL, for plaintiff.

Jeffrey W. Warren, Bush, Ross, Gardner, Warren & Rudy, Tampa, FL, for 21st Century Satellite Communications.

R. Thames, B. Markey, Jacksonville, FL, for Richard R. Morris and Morris Financial Services.

Michael C. Addison, Tampa, FL, for Robert S. Byrch, Donald Ireland and Gabe Panepinto.

W. Keith Fendrick, Tampa, FL, for Ranchod K. Khant.

Andrew D. McNamee, Tampa, FL, for Samma Campbell, William Campbell, Robert Scott, Debra Trout and Steve Trout.

### ORDER ON MOTIONS FOR SUMMARY JUDGMENT

(Doc. Nos. 199 & 203)

ALEXANDER L. PASKAY, Bankruptcy Judge.

This is a confirmed Chapter 11 case and the matters under consideration are two Motions for Summary Judgment filed by some of the Counter–Defendants named in

the Counter–Claim filed by 21st Century Satellite Communications, Inc. (Debtor).

An outline of the procedural history is necessary to understand the present matters that are under consideration. Prior to the commencement of this Chapter 11 Case, Glenn A. Liberatore, individually and as Trustee of the Glenn A. Liberatore Family Living Trust (Plaintiffs/Counter–Defendants) filed a suit in the Circuit Court of the Thirteenth Judicial Circuit, in and for Hillsborough County, Florida, Case No. 01–3319, Div. G. The Plaintiffs/Counter–Defendants named as defendants the following: the Debtor, Robert S. Byrch (Byrch), Spencer G. Tyrrell (Tyrrell), Ranchod K. Khant (Khant), Donald Ireland (Ireland), Gabe Panepinto (Panepinto), Richard R. Morris (Morris), and Morris Financial Services, Inc. (Morris Financial) (collectively referred to as the Defendants).

Prior to the removal of this action, the Plaintiffs/Counter–Defendants filed an Amended Complaint consisting of nine separate counts. This state court action was pending at the time the Debtor filed its Petition for Relief in this Court, on May 8, 2001. Pursuant to 28 U.S.C. § 1452, the Debtor removed the state court action to this Court. Upon removal, the civil suit filed in the State Circuit Court, has remained pending in this Court as Adversary Proceeding No. 01–335.

In the Amended Complaint in Count I, the Plaintiffs seeks rescission of an agreement entitled "Sale/Lease Back Program" (Agreement), and money damages in the amount of $7,000 with prejudgment interest. The claim for rescission is based on the alleged violation by the Defendants of *Fla. Stat.* § 517.081. The damage claim is based on the allegation of an alleged falsity of representation, untrue statements of material facts, and omissions.

The claim in Count II is again based on the alleged violation of *Fla. Stat.* § 517, and the Plaintiffs seek rescission of the Agreement, every "security outlined" [sic], and money damages in the amount of $17,500 represented by a Promissory Note together with attorneys' fees and costs.

The claim in Count III is identical with the previous two. However, this involves rescission of the Agreement and a certain Promissory Note executed on October 5, 1999, pursuant to the Agreement and the Pledge of Personal Properties. This claim is based on, again, a violation of *Fla. Stat.* § 517. Money judgment is sought in the amount of $5,000 together with attorneys' fees.

The Claim in Count IV seeks rescission of a Promissory Note executed on January 18, 2000, in the amount of $63,000. The claim in Count V seeks rescission of a Security Agreement and a money judgment in the amount of $87,200.00. The claim in Count VI seeks rescission of a Promissory Note dated April 10, 2000, in the amount of $40,800 and the Profit Incentive Security Agreement, which seeks to be rescinded, and a money judgment.

The claim in Count VII involves again a claim to rescind a Promissory Note dated June 27, 2000, in the amount of $10,400.00 and seeks, in addition to the rescission, a money judgment. [Sic]. The claim in Count VIII is based on a Promissory Note dated January 8, 1998, in the amount of $5,000 and the Plaintiffs seek rescission and a money judgment. The claim in Count IX involves a purchase of 10,000 shares for $50,000, which, again, the Plaintiffs seek to rescind, and also seek money damages. These are the claims upon which the Plaintiffs seek relief in this Court in this Adversary Proceeding.

To further complicate the matter, on August 8, 2001, the Debtor filed a pleading entitled "Counterclaims" against not only

Liberatore, the Plaintiffs/Counter–Defendants, but also against World Funding Group, Inc. (World Funding); Robert McDuffie (McDuffie); George Greer (Greer); G.A. Grier & Associates, Inc. (Grier & Associates); Craig Goodie (Goodie); Robert Davy (Davy); Orlan K. Boyd, Jr. (Boyd); Gregory Evans (Evans); Larry Harrison (Harrison); Thomas Massabeu (Massabeu); Mike Millis (Millis); Tom Paine (Paine); Joe Wooters (Wooters); Ivan Bauer (Bauer); Howard Baldwin (Baldwin); Oscar Brown (Brown); Steve Brown (Brown); Michael Gainer (Gainer); Brown–Gainer & Associates, Inc. (Brown–Gainer); David Combs (Combs); KD Associates, L.L.C. (KD); Stan Jackson (Jackson); EBC, Inc. (EBC); Alden Kautz (Kautz); Neil A. Lang (Lang); Don Leverett (Leverett); Geffrey Lewis (Lewis); William E. Martin, Jr. (Martin); Douglas Nonaka (Nonaka); Russell Sanguedolce (Sanguedolce); R.B. Sanguedolce, Jr., Inc. (R.B.); Robert Scott; Robert C. Sheldon; Lee Sprimont; Debra Trout (D. Trout); Steve Trout (S. Trout); William Campbell (W. Campbell); Samma Campbell (S. Campbell); Marsha Blevins; Larry Blevins; Larry Blevins & Associates, Inc.; Mark Diamond; Richard R. Morris; World Com Advisors, Inc.; Morris Financial; Robert M. Michutka, individually and d/b/a American Capital Resources; Clare O. Carpenter; Capital for Life, Inc; and Donald Snellgrove (collectively referred to as Brokers/Counter–Defendants).

The Debtor's Counterclaim sets forth seven Counts summarized as follows. In the claim in Count I, the Debtor seeks to avoid constructively fraudulent transfers pursuant to *Fla. Stat.* § 726.105(1)(b). The Debtor seeks the commissions, which ranged from 10% to 30% of the principal amount of the Promissory Notes, 10% to 30% of the amount of the purchase price paid by the perspective participants under the Purchase/Leaseback Agreements, and

5% of the principal amount of the Short Term Notes. Similar to Count I, in Count II, the Debtor seeks to avoid constructively fraudulent transfers pursuant to *Fla. Stat.* § 726.106(1), in which the Debtor seeks the commissions paid to the Brokers.

In Count III, the Debtor seeks to avoid the constructively fraudulent transfers under Section 548(a)(1)(B) of the Code, which provides that a debtor may avoid a transfer that was made within one year if the debtor received less than a reasonably equivalent value in exchange for the transfer, was insolvent or became insolvent. In Count IV, the Debtor seeks to recover against the Brokers for the commissions pursuant to Section 550(a) of the Code.

In Count V, the Debtor seeks a judgment against the Brokers for the total amount of the paid commissions based upon unjust enrichment theory. In Count VI, the Debtor seeks to impose a constructive trust against the Brokers for the paid commissions and in Count VII, the Debtor seeks to impose an equitable lien against the Brokers for the paid commissions.

The precise matters under consideration are the two Motions for Summary Judgment. The first is Motion for Summary Judgment (Doc. No. 203), filed by the Plaintiffs/Counter–Defendants, Liberatore. This Motion is directed to the claims set forth in Counts I—VII of the Counterclaim. The second is Motion for Summary Judgment (Doc. No. 199), filed by the following Broker/Counter–Defendants: S. Campbell, W. Campbell, Scott, D. Trout, and S. Trout, which is also directed to all Counts of the Counterclaim. Also under consideration is the Debtor's Response to the Motions (Doc. No. 222). It appears that on January 2, 2002, there was a suggestion of death of the Defendant Spencer G. Tyrell filed, but it is indicated by the

Debtor that it intends to pursue its claim against the deceased Defendant's estate.

Both movants assert that there are no genuine issues of material fact and based on the same, they are entitled to a judgment in their respective favors on all seven counts set forth in the Counter–Claim, and are entitled to dismissal of the claims with prejudice. The following facts are indeed without substantial dispute and as appear from the record could be summarized as follows:

At the time relevant the Debtor was engaged in the business of providing integrated communication services, including satellite and cable TV services to private communities. In 1997, the Debtor launched an extensive program to raise capital in order to finance its operations. In order to implement this program the Debtor designed a vehicle entitled "Purchase/Leaseback Agreement" (Agreement) to raise additional capital. Under this scheme, the Debtor sold a percentage of certain satellite equipment and installation services to individual investors. During 1997 and 1998, the Debtor entered into 121 separate Agreements with 100 investors raising $1,939,000 new capital.

In addition, as part of its efforts to raise additional capital, the Debtor between August 1997 and September 2000 also issued 1,042 separate "Secured Promissory Notes" to 599 investors, representing $20,142,948 in principal obligation, and 39 short-term secured promissory notes to 36 investors representing $941,000 in principal obligations.

All the following transactions were carried on and transacted by the Brokers/Counter–Defendants who were retained by the Debtor. Under the Agreement with the Brokers, the Brokers were to receive for their services commissions ranging from 10 percent to 30 percent of the principal amount paid by the investor under the Agreement, and 5 percent of the principal on the short term notes.

The commission of Liberatore, who also acted as a broker, was fixed at 20 percent of the investment generated by him. In addition, he also received an "override" based on the investments raised by the Brokers who were working for him. The override was on the 20 percent commission split between Liberatore and the Brokers pursuant to which Liberatore received 8 percent and the Brokers received 12 percent. It is without dispute that the total commissions received by Liberatore including all brokers working with or for Liberatore was $1,528,713. The Brokers, including Liberatore, together received commissions in the amount of $7,382,150.00. *See* Affidavit of Liberatore, paragraphs 12, 13, and 14.

It is without dispute that neither Liberatore nor the Brokers were ever licensed by the National Association of Securities Dealers (NASD); the State of Florida, Department of Banking and Finance; or by any state or federal agency with jurisdiction over the sale of securities.

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION (SEC) LITIGATION

It appears that prior to the commencement of this case, the SEC commenced an enforcement action against the Debtor and sought to prohibit the Debtor from future violations of Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933; Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b); and Rule 10b–5, promulgated pursuant to the Act.

The proceeding was ultimately resolved and the Debtor entered into an agreement with the SEC, the "Consents to the Entry of Permanent Injunction and Other Relief"

[sic] (Consent Agreement). Originally, the SEC and the Debtor agree that the Debtor would disgorge $23,022,948, representing its gains from the investments. *See* paragraph 14 of the Consent Agreement. However, after the filing of this bankruptcy case, the SEC agreed that the Debtor would have to disgorge the sum of $6,110,736, representing the amount paid as commissions. *See* Final Judgment of Permanent Injunction and Other Relief, section V. Based on this determination, the Debtor contends that all of the commissions paid to Liberatore and to the Brokers were fraudulent transfers for the reasons that the Debtor received no reasonable equivalent value since it was required to disgorge its profits, therefore, it is entitled to recoup all of the commissions earned.

It is without dispute that Liberatore received, in his individual capacity, and those paid to all Brokers working with him, the sum of $1,528,713. That while these commissions were paid, Liberatore was not licensed, as noted earlier to sell securities. According to the Debtor since the sales of investments by Liberatore and the Brokers were illegal under the Securities Act of 1933, 15 U.S.C. § 77(a), *et seq.* and the applicable Blue Sky Statutes of the State of Florida, then it is entitled to monies paid as commissions.

The foregoing leaves no doubt that the facts relevant and germane to the resolution of the issue before this Court, are indeed without dispute. However, this brings in return, the ultimate issue, which is whether or not because of the determination of the SEC, that the investments sold by Liberatore and the Brokers were illegal and invalid and in violation of Section 5(a), 5(c), and 17(a) of the Securities Act of 1933; Section 10(b) of the Securities Exchange Act of 1934; and Rule 10b–5 promulgated by the Commission for the purposes of implementing the statute, the commissions can be recovered as a fraudulent transfer based on the contention that the Debtor did not receive the reasonable equivalent value for all of these payments paid to Liberatore and these Brokers.

The claims asserted by the Debtor are based on *Fla. Stat.* § 726.105, which grants the power to a creditor and in the context of a bankruptcy to a chapter 11 debtor pursuant to Section 544(b) of the Code, to set aside transfers if a debtor did not receive a reasonable equivalent value in exchange for a transfer of an obligation. The claim asserted here by the Debtor is not based on actual fraud and there is no allegation here that these payments were made with the specific intent to hinder, delay, or defraud creditors, the theory under *Fla. Stat.* § 726.105(a). Thus, the viability of the Debtor's claim must be tested on the standard of "reasonable equivalent value." While *Fla. Stat.* § 726.104, generally defines what value is, what is "reasonable equivalent value," under the case law, should be based on the specific facts and circumstances relevant to the transaction. In the present instance, unlike in other contexts, whether or not what the Debtor received, 70% or less, is not relevant because the contention in this case is that what it received, i.e. the investments, were worthless, because it was ultimately found to be in violation of applicable Securities law. There is nothing in this record that warrants a finding that the Debtor paid commissions to Liberatore or the Brokers for investments yet to be secured but actually for the investments made, which was the basis for computing the commission. A payment, ordinarily for services actually rendered, can only be attacked as a fraudulent transfer on the theory that what the debtor received was either worthless or had value less than reasonable equivalent for the monies paid for the services.

There is nothing in this case, which indicates that the Debtor is complaining about the amount actually paid to Liberatore and the Brokers. It would be ill behooved indeed for the Debtor to complain about the amounts of commissions paid when they were paid pursuant to an agreement which fixed the percentage of the commissions, which agreement was arrived at arms-length with Liberatore and the Brokers. This being the case, the Court must focus strictly on each transaction as occurred, at the time it occurred, and for this reason, the fact that the business of the Debtor in selling these investments was ultimately found to be illegal and the Debtor was required to disgorge the commissions, is of no consequence.

Summary judgment is granted to avoid unnecessary trials when there is no genuine issue of material fact in dispute. The party moving for summary judgment bears the initial burden of demonstrating that no genuine issue of material fact exists and that judgment should be granted in its favor as a matter of law. F.R.B.P. 7056. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). There is no genuine issue for trial only if the record, taken as whole, could not lead a rational trier of fact to find for the nonmoving party on the motion for summary judgment. On summary judgment motions, inference to be drawn from underlying facts must be viewed in light most favorable to parties opposing the motion. Moreover, existence of material factual dispute is sufficient to preclude a motion for summary judgment, only if the disputed fact is determinative of the outcome under applicable law. There is no genuine issue for trial and summary judgment should be granted when the rec-

ord, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Anderson, supra* at 255, 106 S.Ct. 2505; *Matsushita supra* at 586, 106 S.Ct. 1348.

Applying the foregoing principles to the facts, it appears at first blush that there is indeed no genuine issue of material fact for trial. This is so because the record is clear that the Counter–Defendants did procure investments for the Debtor in excess of $6,110,7367. It is equally without dispute that they had an agreement entered into prior to procuring these investments, which were agreed upon in an arms-length transaction, to determine a fixed percentage of commissions that they are entitled to earn. It is equally without dispute that the Brokers did procure these investments, did earn, and did receive the commissions; but it is not clear from this record whether or not they knew when they entered into the agreement that what whey were selling, in procuring these investments was illegal. For summary judgment to be granted, the moving party bears the burden of demonstrating that there are no genuine issues of material fact *and* that judgment should be granted in its favor *as a matter of law.* (Emphasis supplied). In this instance, the movants fail to establish that they are entitled to summary judgment as a matter of law.

The movants rely on the case of *In re Churchill Mortgage Inv. Corp.,* 256 B.R. 664 (Bankr.S.D.N.Y.2000), which is instructive. In *Churchill Mortgage,* the trustee brought sixty-one fraudulent transfer actions against certain brokers to recover 5 million dollars paid to the brokers as commissions. The trustee's claim was based on the theory that the payment of commissions to the brokers was fraudulent because the commissions were paid by an entity that operated a Ponzi scheme. The bankruptcy court, considering the motions

for summary judgment and motions to dismiss, held that in that case, the brokers performed innocent services, which produced mortgages or additional investors for the debtor. The significance of consequence of the broker deal transaction, as it related to the debtor's overall Ponzi scheme, was found to be of no relevance. *Churchill, supra* at 674. The court noted that the brokers in that case were hired and compensated to initiate mortgages and solicit investors. They did so with no knowledge of any wrongdoing and there was no allegation that the brokers knew about the Ponzi scheme, nor any unreasonable high or excessive commissions paid to the brokers for the standard broker services.

In the instance case, the fact that Liberatore or the Brokers were not registered to sell securities and received commission payments pursuant to the agreement based on the investment they secured, has no relevance in connection to the fact that after the transactions, the SEC determined that the sale of the investments were covered by the statutes and they were illegal contracts and legally unenforceable. Absence of any facts in this record which would warrant a finding that the Brokers knowingly sold these investment that they knew were covered by the statute, and that they are themselves violating the law, the payments of commissions cannot be set aside as a fraudulent transfer.

The Debtor received appropriate *quid pro quo* for the payment of the commissions and the fact that what they received ultimately became worthless and was required to repay those commissions, is not sufficient to find and conclude that the payments should be set aside and recovered under fraudulent transfer theory, under *Fla. Stat.* § 726.105(1)(b).

The Debtor relies heavily in support of its position on the case of *In re Randy*, 189 B.R. 425 (Bankr.N.D.Ill.1995). The crucial difference between *Randy* and this case was that *Randy* involved a Ponzi scheme, which is inherently fraudulent *ab initio*. This Court has no difficulty in accepting the proposition that if a broker, who is a knowing participant in a fraudulent scheme, receives a commission paid in furtherance of a criminal enterprise, a court should compel him to disgorge all of the monies received. This Court however, has difficulty in accepting this proposition unless it is established without dispute that Liberatore and the Brokers were put on notice and knew what they were selling before they embarked to implement the investment program, that the investments were securities and subject to SEC rules and regulations that clearly prohibit the selling of securities without a license. In this connection, it should be pointed out that it is unclear from this record whether or not the investigation by the SEC, that is the investigation of the investments as securities began during the time the Brokers were selling the investments or occurred completely after the Brokers earned and received their commissions. Be as it may, the Consent Agreement was approved by this Court on September 26, 2001, when the commissions were already earned and paid. Thus, this Court accepts the principles of *Randy* but it should be limited to commissions paid to brokers in furtherance of a criminal enterprise, which is fraudulent *ab initio*. This Court concludes that the principles espoused in *Churchill* are the more appropriate standard to judge whether or not the payments of the commissions were fraudulent.

As noted by the Bankruptcy Court in *In re World Vision Entertainment, Inc.*, 2002 WL 459433 (Bankr.M.D.Fla.2002), to extend *Randy*, to its logical extreme, would be to authorize the debtor to sue and

recover against every vendor who supplied goods to the debtor and paid for the goods; and every employee of the debtor even to the lower level and clerical employees, would be required to return their wages, just because the payor, i.e., their employer, was involved in an investment project ultimately determined to be illegal.

Based on the foregoing, this Court is satisfied that it is inappropriate to dispose of the fraudulent transfer claims asserted by the Debtor on summary judgment and a complete record should be established of whether or not Liberatore and Brokers knowingly participated in investment program by selling investments and they know or had reason to believe that they should have been registered securities dealers and were violating the SEC.

Considering the claim to impose a constructive trust, the doctrine of constructive trust is an equitable concept designed to avoid fraud, unlike a resulting trust, which arises when the legal estate and property is disposed of, conveyed or transferred, but the intent appears that the beneficial interest is not to go or to be enjoyed with the legal title, and a trust is implied or results in favor of the person whom equity deems to be the real owner. The essential elements of a constructive trust are a confidential relationship by which one acquires an advantage, which one should not in equity and good conscience retain. *See Steigman v. Danese,* 502 So.2d 463 (Fla. 1st DCA 1987), *vacated on other grounds, In re Estate of Danese,* 601 So.2d 570 (Fla. 1st DCA 1992). *See also Bender v. Centrust Mortgage Corporation,* 51 F.3d 1027 (11th Cir.1995). Another essential element for the assertion of a constructive trust is a specific identifiable res or identifiable property that can be clearly traced in the assets of the defendant. *Trend Setter Villas of Deer Creek v.*

*Villas on the Green, Inc.,* 569 So.2d 766 (Fla. 4th DCA 1990). There is nothing in this record to establish that the Debtor sought to place a trust on a specific identifiable piece of property, which is a necessary element and if it cannot be traced, it cannot be imposed on a general assets.

Considering the claim to impose an equitable lien, under Florida law, a necessary element of recovery under this principle is a clear showing of fraud or misrepresentation perpetrated upon the party claiming the lien. *Merritt v. Unkefer,* 223 So.2d 723 (Fla.1969); *Jennings v. Connecticut General Life Insurance Company,* 177 So.2d 66 (Fla. 2nd DCA 1965). There is nothing in this record to establish there is an identifiable res for an equitable lien to attach.

In light of the foregoing authority, this Court determines that summary judgment is not appropriate at this time. It is necessary to conduct a trial with respect to Counts I, II, III, IV, and V. With respect to Counts VI, and VII, the same shall be dismissed without prejudice.

Accordingly, it is

ORDERED, ADJUDGED AND DECREED that the Motions for Summary Judgment be, and the same are hereby, denied. It is further

ORDERED, ADJUDGED AND DECREED that a pre-trial conference shall be held on July 2, 2002, beginning at 1:30 p.m. at Courtroom 9A, Sam M. Gibbons United States Courthouse, 801 N. Florida Ave., Tampa, Florida, to consider the matters specifically denied herein.