# United States Bankruptcy Appellate Panel
## FOR THE EIGHTH CIRCUIT

_____

No. 10-6056

_____

In re:  Grant A. Kendall;           *
  Andrea L. Kendall                 *
                                    *
      Debtors                       *
                                    *
Kip M. Kaler, as Bankruptcy Trustee *    Appeal from the United States
  for Grant A. Kendall and          *    Bankruptcy Court for the
  Andrea L. Kendall                 *    District of North Dakota
                                    *
      Plaintiff - Appellant         *
                                    *
           v.                       *
                                    *
Able Debt Settlement, Inc.          *
                                    *
      Defendant - Appellee          *

_____

Submitted:  November 4, 2010
Filed: December 9, 2010

_____

Before FEDERMAN, VENTERS, and SALADINO, Bankruptcy Judges

FEDERMAN, Bankruptcy Judge

Kip M. Kaler, as Bankruptcy Trustee for Debtors Grant A. Kendall and Andrea L. Kendall, appeals from the Judgment of the Bankruptcy Court[1] finding that the Kendalls' payments to Able Debt Settlement, Inc. for debt settlement services were not fraudulent transfers pursuant to 11 U.S.C. § 548(a)(1)(B). For the reasons that follow, we AFFIRM.

BACKGROUND

In 2008, the Kendalls realized that they were in financial trouble. They considered filing for bankruptcy protection at that time, but feared it would cause problems in assisting their children obtaining college loans. They initially consulted a nonprofit organization known as "The Village" for credit counseling, but that organization proposed a plan which would have required a $748 monthly payment, a payment they could not afford.

Then, after seeing the website for Able Debt Settlement, Inc., Debtor Andrea Kendall contacted Able via the internet. A representative of Able, Jason Irwin, contacted the Kendalls in response to Andrea's e-mail.[2] Irwin e-mailed her the necessary documents, and she filled them out with information concerning the Kendalls' creditors, amounts of debts, and monthly income and expenses. The forms showed that the Kendalls had monthly disposable income of negative $158. Able sent the Kendalls a service agreement dated February 2, 2008, which the Kendalls signed on February 13, 2008, and returned to Able by fax.

---

[1] The Honorable William A. Hill, United States Bankruptcy Judge for the District of North Dakota.

[2] Irwin was not an actual employee of Able. Rather, he was an employee of Experience Financial, Inc., an affiliate of Able, which undertook the initial process to enroll people into Able's program. Irwin received a share of the fees the Kendalls paid to Able.

According to a "Program Worksheet" dated February 13, 2008, prepared by Able, Able proposed a monthly payment of $135 for sixty months to settle the debts with the Kendalls' creditors and to pay Able's fees. Phase 1 of the program offered by Able included a $675 retainer fee paid over the first five months of the plan, at $135 per month. Phase 2 included an additional service fee to be paid at $61.04 per month for 27 months. Phase 2 also provided for the Kendalls to start a savings account and to contribute $73.96 which would be used to pay the creditors. Phase 3 then provided for the Kendalls to contribute $135 per month to the savings account to pay creditors, apparently without a third component to the service fee. In sum, the plan provided for the Kendalls to pay their creditors a total of $5,776.86 on debts totaling $22,125.15. Able's total service fee for the program was $2,323.14.

Andrea Kendall wrote a notation on the Program Worksheet stating that the Kendalls thought they could pay $200 per month toward the program. She also indicated that there were two creditors missing from the list of creditors, which they wanted to be included in the program. Based on that, Able sent the Kendalls a new Program Worksheet. Under the program proposed there, the Kendalls were to pay $200 per month for sixty months. Phase 1 included an $800 retainer fee, paid over the first four months of the program, at $200 each. Phase 2 included a service fee of $100.93 per month for 24 months and provided for the Kendalls to contribute $99.07 per month to a savings account to pay creditors. Phase 3 called for the Kendalls to pay $200 per month into the savings account to pay creditors. Under this plan, the Kendalls would pay their creditors an estimated $8,777.72 on debts totaling $26,852.32, and would pay Able a total service fee of $3,222.28.

The Kendalls signed an authorization for Able to automatically withdraw funds from their checking account each month to cover the service fees. Through the automatic withdrawals, they made payments of $200 each on February 25, March 25, April 25, and May 25, 2008. On June 25, 2008, the automatic withdrawal payment decreased to $100.93. As is apparent, these automatic withdrawals covered only the

service fees to Able. The Kendalls were supposed to, on their own, put the suggested amounts into a savings account to fund the settlements Able reached with creditors on the Kendalls' behalf.

The Kendalls did open a savings account and, over the next four to six months, they deposited $300 into it. After that, the Kendalls did not have the funds to continue depositing into the savings account. According to Andrea Kendall, Able never asked whether they had set up the savings account or checked on the progress in their funding it, although she testified she knew it was their responsibility to do so. The Kendalls continued to pay the $100.93 toward the service fees, via the authorized automatic withdrawals, though February 25, 2009.

The Kendalls were advised by Able about a possible settlement with one of the creditors whereby the Kendalls could settle that debt for a payment of $1,002.78 due on or before May 3, 2008. They did not have the funds the pay that settlement. Meanwhile, the Kendalls also attempted to talk to some of their creditors on their own, but the creditors told them they could not talk to them because they were enrolled in Able's program.

On June 16, 2008, after receiving a summons and complaint related to one of their credit card debts, Andrea Kendall sent Able a letter inquiring as to whether the creditor had refused to participate in the program. She testified that Able told her that it had contacted the creditor and that the Kendalls might need to seek legal counsel. Ultimately, the credit card company obtained two judgments against the Kendalls, and their wages were garnished in the fall of 2008.

By early 2009, the Kendalls' financial circumstances had deteriorated further. Among other things, a child support payment of $600 was added to their monthly obligations. On March 25, 2009, the Kendalls signed a notice of cancellation of the agreement with Able. Able sent them an acknowledgment of the termination from the

4

program, indicating that the Kendalls had paid Able service fees totaling $1,708.37. They filed a Chapter 7 bankruptcy petition on April 3, 2009.

The Chapter 7 Trustee then filed an adversary complaint against Able, seeking to recover the $1,708.37 in service fees as a fraudulent transfer under the Bankruptcy Code's constructive fraud provision, § 548(a)(1)(B).[3] The Bankruptcy Court entered Judgment in favor of Able, and against the Trustee. The Trustee appeals.

STANDARD OF REVIEW

We review findings of fact for clear error, and legal conclusions *de novo*.[4]

DISCUSSION

Section 548(a)(1)(B) of the Bankruptcy Code provides, in relevant part:

(a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily –

* * *

---

[3] The Trustee's Amended Complaint and trial documents also alleged that the transaction violated North Dakota's fraudulent transfer statutes, *see* N.D.C.C. §§ 13-02.1-04(1)(b) and 13-02.1-05(1) and 11 U.S.C. § 544, as well as North Dakota's statutes barring unlawful sales or advertising practices, *see* N.D.C.C. § 51-15-01 *et seq.* However, the Bankruptcy Court's Judgment addressed only the § 548 issue, and summarily denied all other requested relief. The Trustee does not appeal the denial of the North Dakota fraudulent transfer and unlawful practices causes of action.

[4] *First Nat'l Bank of Olathe v. Pontow (In re Pontow),* 111 F.3d 604, 609 (8th Cir. 1997); *Sholdan v. Dietz (In re Sholdan),* 108 F.3d 886, 888 (8th Cir. 1997); Fed. R. Bankr. P. 8013.

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation[.][5]

Because there was no dispute that the transfers fell within two years of the filing of the Kendalls' bankruptcy petition, and that the Kendalls were insolvent at the time of the transfers, the only issues were whether the Kendalls received value, and if so, whether the services provided by Able were reasonably equivalent to the $1,708.37 in fees paid.

Finding in favor of Able, the Bankruptcy Court concluded that the Kendalls received reasonably equivalent value in exchange for the service fees. The Trustee asserts this was error because (i) the contract between the Kendalls and Able was illegal under North Dakota statute and, therefore, void and (ii) the value of the fees was not reasonably equivalent to the services provided because there was no possibility that the Kendalls would avoid bankruptcy by participating in the program.

As to the first argument, namely, that the contract was illegal under North Dakota law, the Trustee points to § 13-06-02 of the North Dakota Century Code, which provides that "[a]ny person who engages in the business of debt adjusting, unless exempted under the provision of section 13-06-03, is guilty of a class A misdemeanor."[6] Section 13-06-01 defines "debt adjusting" as follows:

"Debt adjusting" means the making of a contract, express or implied, with a debtor whereby the debtor agrees to pay a certain amount of

_____

[5] 11 U.S.C. § 548(a)(1)(B).

[6] N.D.C.C. § 13-06-02.

money or other thing of value periodically to the person engaged in the debt adjusting business who shall, for a consideration, distribute the same among certain specified creditors in accordance with a plan agreed upon. The term includes a debt adjustment, budget counseling, debt management, or debt pooling service or the holding of oneself out, by words of similar import, as providing services to debtors in the management of their debts and contracting with the debtor for a fee to:

> a. Effect the adjustment, compromise, or discharge of any account, note, or other indebtedness, of the debtor; or

> b. Receive from the debtor and disburse to the debtor's creditors any money or other thing of value.[7]

The Trustee's argument turns on the interpretation of this statute which is, undeniably, internally inconsistent: The first sentence of the statute defines "debt adjusting" to mean contracts under which the debtor pays money to the debt adjuster who then, for consideration, pays the money out to creditors pursuant to a plan. That sentence would not apply to Able's activities here because it did not agree to make payments to creditors. However, the statute then provides that the term "debt adjusting" includes those types of contracts where the debt adjuster pays the debtor's money out to creditors, *or* contracts to merely compromise debts, such as the one in this case. So, while the first sentence suggests that the statute would not apply to Able, the second sentence suggests that it would.

The Bankruptcy Court concluded that the first sentence controlled, such that the prohibition against debt adjusting applies only to contracts whereby the debt adjuster handles the debtor's money and pays it out to creditors. Merely negotiating or compromising debts on behalf of a debtor for a fee is, therefore, permissible. As a result, the Court concluded, the contract between Able and the Kendalls was legal under the statute.

_____

[7] N.D.C.C. § 13-06-01.

7

The Trustee's argument here focuses on general canons of statutory interpretation and what he asserts is the presumed legislative intent.[8] However, we need not decide whether the Court's interpretation of the North Dakota statute was correct because, even assuming that the Trustee is correct that the North Dakota statute prohibits the type of debt adjusting involved here – namely, the mere compromising of debts for a fee – that premise would not provide the Trustee with a remedy under § 548 of the Bankruptcy Code.

The mere fact that a contract is void, unenforceable, or illegal does not require a finding that there was no reasonably equivalent value given for purposes of § 548(a)(1)(B). As one Court has said, "there is nothing in the plain language of [§ 548] . . . suggesting an illegality exception to the 'reasonably equivalent value' requirement."[9] Thus, even if the contract with Able violated § 13-06-02, the Court was still required to determine whether the Kendalls received reasonably equivalent value, based on what was actually exchanged.

In addition, § 13-06-02 is a regulatory statute which provides only criminal penalties for its violation. It provides no civil remedy. Perhaps the Kendalls could have avoided the contract or even sought damages against Able on some ground in state court, but the only remedy provided under the statute on which the Trustee relies is criminal in nature. In any event, the Trustee cannot rely on § 13-06-02 as a basis for constructive fraud under § 548(a)(1)(B).

---

[8] There is scant legislative history to suggest what the North Dakota legislature intended by the language it used. As a result, the Trustee relies on language in debt adjustment statutes from other states.

[9] *In re Carrozzella & Richardson*, 286 B.R. 480, 491 (D. Conn. 2002) (in the context of a Ponzi scheme) (affirming *In re Carrozzella & Richardson*, 270 B.R. 92 (Bankr. D. Conn. 2001) ("This Court does not share the legal view that a transaction's illegality deprives that exchange of value.")). *See also In re Universal Clearing House Co.*, 60 B.R. 985, 1000 (D. Utah 1986) ("We conclude that a determination of whether value was given under section 548 should focus on the value of the goods and services provided rather than on the impact that the goods and services had on the bankrupt enterprise.").

Having concluded that the contract's alleged illegality does not preclude a finding of reasonably equivalent value, we turn to whether the Bankruptcy Court erred in concluding that the value of Able's services was reasonably equivalent to the $1,708.37 the Kendalls paid for them. The question of whether the Kendalls received reasonably equivalent value for the fees is a factual determination which we reverse only if clearly erroneous.[10]

The Trustee bore the burden of proving, by a preponderance of the evidence, that the exchange was not for reasonably equivalent value.[11] "A transfer is in exchange for value if one is the quid pro quo of the other."[12] The Kendalls' payment of fees was, clearly, in exchange for Able's debt settlement services. Thus, the ultimate question is whether the value of the services was reasonably equivalent to the $1,708.37 the Kendalls paid for them.

The Bankruptcy Court correctly stated the law: "The concept of reasonably equivalent value is a means of determining if the debtor received a fair exchange in the market place for the goods transferred. Considering all the factors bearing on the sale, did the debtor receive fair market value for the property."[13] It is a "question of fact requiring the court to consider all factors bearing [on] value in the marketplace."[14] "[O]ften there is nothing to consider beyond simply comparing the fair market value of what the debtor transferred against the fair market value of what the debtor

---

[10] *In re Ozark Restaurant Equip. Co.*, 850 F.2d 342, 344 (8th Cir. 1988).

[11] *In re Southern Health Care of Arkansas, Inc*., 309 B.R. 314, 319 (B.A.P. 8th Cir. 2004).

[12] *Pummill v. Greensfelder, Hemker & Gale (In re Richards & Conover Steel Co.)*, 267 B.R. 602, 612 (B.A.P. 8th Cir. 2001).

[13] *Id.* (citation omitted).

[14] *Kaler v. Red River Commodities, Inc. (In re Sun Valley Prods., Inc.)*, 328 B.R. 147, 156 (Bankr. D. N.D. 2005).

received. If the two values are reasonably similar, no fraudulent transfer has taken place."[15] Other factors courts consider include the good faith of the parties and whether the transaction was an arm's length transaction between a willing buyer and a willing seller.[16] The inquiry is "fundamentally one of common sense, measured against market reality."[17]

The Bankruptcy Court found that the Program Worksheets clearly indicated what the cost of participation in the program would be to the Kendalls. The service agreement states that Able makes no guarantees about the outcome of its services, and Andrea Kendall testified that she knew it was their responsibility to contribute to the savings account to fund any settlements Able reached with the creditors. In other words, as the Bankruptcy Court said, the Kendalls knew the cost, the requirements, and the risk of the program, and decided it was worth it. The Court found that it was an arm's length transaction between a willing buyer and willing seller, was entered into in good faith and for fair market value. None of these findings was clearly erroneous.

The Trustee asserts that the Bankruptcy Court ignored the fact that the stated purpose of the program was to avoid bankruptcy and that it should have been apparent, even at the time they entered into it, that that purpose was impossible, given the Kendalls' monthly shortfall of $158. He also asserts that Able and Irwin did not verify the numbers the Kendalls gave them. However, Andrea Kendall stated on her program papers that they believed they could make a payment of $200 per month, despite the shortfall, and Grant Kendall testified that he thought they could pay the $200 through belt tightening. It is not necessarily incredible for debtors to believe

---

[15] *Id.* (citations omitted).

[16] *Id.*

[17] *Leonard v. Mylex Corp. (In re Northgate Computer Systems, Inc.)*, 240 B.R. 328, 365 (Bankr. D. Minn. 1999).

they can tighten their belts to make desired payments; indeed, debtors in Chapter 13 bankruptcy cases or those seeking to reaffirm debts frequently say, and do, just that.

Finally, the Trustee asserts that success in the program was impossible because the creditors would not accept the nominal payments to be made over a 60-month period. However, although there was evidence that some of the creditors were rejecting offers of settlement, there was no actual evidence that Able could not have ultimately negotiated workable amounts with the creditors as a whole – indeed, Able was still in the process of negotiating with many of the creditors when the Kendalls withdrew from the program. And, as stated, the program had no guarantees. At the time the Kendalls entered the program, there was no way of knowing for sure how the negotiations would go. As the Trustee says, the parties were unable to achieve the intended goal of avoiding bankruptcy, but it would have been inappropriate for the Bankruptcy Court to view the transaction with the benefit of such hindsight.[18] So long as there is some chance that a contemplated investment will generate a positive return at the time of the disputed transfer, value has been conferred.[19] As the Trustee bears the burden of proof on this issue, we cannot say that the Court erred in not finding the program to be impossible from its inception.

## CONCLUSION

Based on the foregoing, we conclude that the Bankruptcy Court did not clearly err in finding that the Kendalls received reasonably equivalent value for the fees they paid to Able. Accordingly, the Judgment is AFFIRMED.

---

[18] *See Peltz v. Hatten*, 279 B.R. 710, 738 (D.Del.) ("[I]t is not the place of fraudulent transfer law to reevaluate or question those transactions with the benefit of hindsight."), *aff'd* 60 Fed.Appx. 401 (3d Cir. 2003).

[19] *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 152 (3d Cir. 1996).