**In re CAPITOL INVESTMENTS, INC. and Kevin Neary Shapiro, Debtors.**

**Joel Tabas, Trustee, Plaintiff,**

v.

**Joseph Lehman, individually, Defendant.**

**Bankruptcy Nos. 09–36408–LMI–BKC, 09–36418–BKC–LMI.**

**Adversary No. 11–3125–BKC–LMI.**

United States Bankruptcy Court, S.D. Florida.

June 14, 2012.

---

Andrea L. Rigali, Esq., Gary M. Freedman, Esq., Mark S. Roher., Miami, FL, for Plaintiff.

Arthur H. Rice, Esq., Eun Chang, Ft. Lauderdale, FL, for Defendant.

### ORDER GRANTING IN PART AND DE-NYING IN PART DEFENDANT'S MOTION TO DISMISS

LAUREL M. ISICOFF, Bankruptcy Judge.

This matter came before me on April 5, 2012 upon the Motion to Dismiss All Claims Asserted by Joel L. Tabas, Trustee, Against Joseph M. Lehman (ECF # 12) (the "Motion to Dismiss") filed by the Defendant, Joseph M. Lehman.[1] Having considered the record, the applicable law, arguments of counsel, and the Complaint, the Defendant's Motion to Dismiss is granted in part and denied in part.[2]

### Background

Nevin Shapiro ("Shapiro") was the owner and sole shareholder of Capitol Investments USA, Inc. ("Capitol"). Shapiro, holding out Capitol as a wholesale distribution business, raised over $800 million from at least 60 "lenders."[3] From 2005 to 2009, Capitol actually ran a Ponzi scheme in which the infusion of capital paid by new lenders was used to pay prior lenders. In November 2009, a group of Capitol's "lenders" filed involuntary bankruptcy proceedings against both Capitol and Shapiro. Joel L. Tabas was appointed the chapter 7 trustee in both cases (the "Trustee").

The facts in this case are not in dispute. The Defendant, Joseph M. Lehman ("Lehman" or the "Defendant"), throughout the duration of the Capitol Ponzi scheme, accepted and paid off illegal bets placed by Shapiro on sporting events. Between December 21, 2007 and November 24, 2009 Shapiro had no other source of income other than funds derived from Capitol. Between December 21, 2007 and November 24, 2009 Shapiro transferred a total of $1,345,310 (the "Transfers") to Lehman to pay for Shapiro's gambling losses. Shapiro used two bank accounts, both in his name, to pay Lehman.

### The Adversary Proceedings

The Trustee filed two adversary proceedings against Lehman: one as chapter 7 Trustee on behalf of the Capitol bankruptcy estate (ECF # 1 in Adv. Case No. 11–03125) (the "Capitol Adversary") and the other as chapter 7 Trustee of the Shapiro bankruptcy estate on behalf of the Shapiro bankruptcy estate (ECF # 1 in Adv. Case No. 11–03126) (the "Shapiro Adversary") (together the "Adversary Proceedings"). On February 2, 2012 the Adversary Proceedings were procedurally consolidated into Adv. Case No. 11–03125.

The Complaint in the Capitol Adversary (the "Capitol Complaint") seeks to recover the Transfers to Lehman under theories of actual fraud and constructive fraud. In Count I, the Trustee alleges the Transfers are recoverable pursuant to 11 U.S.C. § 548(a)(1)(A) as actually fraudulent transfers from Capitol to Lehman. In Count II, the Trustee alleges that the Transfers are recoverable pursuant to 11 U.S.C. § 548(a)(1)(A) and 11 U.S.C. § 550, as ac-

---

1. The parties also filed the following pleadings: Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss All Claims Asserted by Joel L. Tabas, Trustee, Against Joseph Lehman, and Incorporated Memorandum of Law (ECF # 20); and Defendant's Reply to Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss All Claims Asserted by Joel L. Tabas, Trustee, Against Joseph Lehman (ECF # 29).

2. I issued my oral ruling on the Motion to Dismiss April 17, 2012 (Transcript, ECF # 47). This memorandum opinion is a more detailed version of my oral ruling.

3. The manner in which Shapiro raised funds from his victims was through short term lending. *See generally Tabas v. Sheppard,* Case No. 11–02587, ECF # 80 (Bankr.S.D.Fla. 2011). The manner in which Shapiro raised funds for his Ponzi scheme is not relevant to this opinion.

tually fraudulent transfers from Capitol to Shapiro, and then from Shapiro to Lehman as the subsequent transferee. In Count III, the Trustee alleges that the Transfers are recoverable pursuant to 11 U.S.C. § 548(a)(1)(B) as constructively fraudulent transfers from Capitol to Lehman. In Count IV, the Trustee alleges the Transfers are recoverable pursuant to 11 U.S.C. § 548(a)(1)(B) and 11 U.S.C. § 550, as constructively fraudulent transfers from Capitol to Shapiro, and then finally to Lehman as the subsequent transferee.

The Complaint in the Shapiro Adversary (the "Shapiro Complaint") seeks virtually the same relief as the Capitol Complaint with variations in the transfer chain. In Count I, the Trustee alleges the Transfers are recoverable pursuant to 11 U.S.C. § 548(a)(1)(A) as actually fraudulent transfers from Shapiro to Lehman. In Count II, the Trustee alleges that the Transfers are recoverable pursuant to 11 U.S.C. § 548(a)(1)(A) and 11 U.S.C. § 550, as actually fraudulent transfers from Shapiro to Lehman as the initial transferee. In Count III, the Trustee alleges that the Transfers are recoverable pursuant to 11 U.S.C. § 548(a)(1)(B) as constructively fraudulent transfers from Shapiro to Lehman. In Count IV, the Trustee alleges the Transfers are recoverable pursuant to 11 U.S.C. § 548(a)(1)(B) and 11 U.S.C. § 550, as constructively fraudulent transfers from Shapiro to Lehman as the initial transferee.

The Defendant filed the Motion to Dismiss seeking to dismiss all the claims in both Complaints, presumably pursuant to Federal Rule of Civil Procedure 12 made applicable to these proceedings pursuant to Federal Rule of Bankruptcy Procedure 7012.[4]

**Jurisdiction and Standard of Review**

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

In evaluating a motion to dismiss under Rule 12(b)(6), the court must accept all factual allegations in the complaint as true. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). "[T]he relevant question for purposes of a motion to dismiss under Rule 12(b)(6) is 'whether, assuming the factual allegations are true, the plaintiff has stated a ground for relief that is plausible.'" *In re Luca,* 422 B.R. 772, 775 (Bankr.M.D.Fla.2010) (citing *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1959, 173 L.Ed.2d 868 (2009)). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555–556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (internal citations omitted).

**Analysis**

The Defendant's Motion to Dismiss raises three reasons for dismissal: (1) the Complaints raise inconsistent allegations, (2) the timing and tracing of the Transfers at times do not add up, and (3) that in the case of Shapiro, Shapiro received reasonably equivalent value for the Transfers,

---

**4.** The Defendant did not cite to any rule in the Motion to Dismiss but the Motion is based on the Trustee's alleged failure to state a cause of action on the various grounds enumerated in the Motion.

and, moreover, in each instance, the Transfers were made for value and in good faith by Lehman.

### a) Inconsistent Allegations

■ The Defendant argues that the Complaints allege mutually inconsistent facts that warrant their dismissal.[5] The Shapiro Complaint alleges that the funds transferred to Lehman were Shapiro's property because Shapiro had control over the money in his bank accounts, while the Capitol Complaint alleges that the funds transferred from Capitol to Shapiro were Capitol's property. The Defendant argues that he cannot be a direct transferee of Shapiro in the Capitol Adversary, when the Trustee in the Shapiro Adversary alleges that Shapiro got all of his money from Capitol. The issue, for purposes of the Shapiro Complaint, in order to establish a fraudulent transfer, is whether Shapiro had control over the money in his bank accounts and therefore the funds transferred by Shapiro to Lehman constituted Shapiro's property, while the allegations in the Capitol Complaint are that the funds transferred from Capitol to Shapiro were Capitol's property. These allegations are not mutually exclusive nor are these allegations inconsistent. Indeed, counsel for the Defendant conceded during the hearing that if the Trustee in the Capitol case was not the same person as the Trustee in the Shapiro case, each trustee could bring a complaint such as the Trustee has filed in these cases. Just because the trustee in each case happens to be the same person does not, *ipso facto*, render these pleadings inconsistent. The Defendant is therefore not entitled to dismissal on this basis.[6]

### b) Timing and Tracing of Transfers

■ The Defendant argues, and the Trustee concedes, that some of the described transfers from Capitol to Shapiro took place after Shapiro transferred funds to Lehman, and that those transfers cannot constitute transfers for which Lehman is the subsequent transferee. However, I also agree with the Trustee that dollar for dollar tracing is not required with respect to funds that were actually in the Capitol account and then transferred to Shapiro prior to any particular transfer to Lehman. *See IBT Int'l, Inc. v. Northern (In re Int'l Admin. Servs., Inc.)*, 408 F.3d 689, 708 (11th Cir.2005) ("In an action seeking recovery, the plaintiff has the burden of tracing funds it claims to be property of the estate. Although we agree with this proposition, it is also true that proper tracing does not require dollar-for-dollar accounting.") (citations omitted). Accordingly, I find that the Defendant is entitled to dismissal of those counts in the Capitol Complaint relying on transfers made to Shapiro after Shapiro made transfers to Lehman, but grant the Trustee leave to amend the Capitol Complaint to properly plead the relief sought.

---

**5.** Courts must liberally construe and accept as true allegations of fact in the complaint and inferences reasonably deductible therefrom, but need not accept factual claims that are internally inconsistent, facts which run counter to facts of which the court can take judicial notice, conclusory allegations, unwarranted deductions, or mere legal conclusions asserted by a party. *Campos v. I.N.S.*, 32 F.Supp.2d 1337, 1343 (S.D.Fla.1998) citing *Ellen S. v. The Florida Bd. Of Bar Examiners*, 859 F.Supp. 1489, 1492 (S.D.Fla.1994).

**6.** The Trustee's counsel has acknowledged that the Trustee is not seeking more than one recovery from Mr. Lehman, which, I believe, puts Mr. Lehman in a better position than if the two estates had two separate trustees, each seeking a recovery.

### c) Gambling Debts as Providing "Reasonably Equivalent Value"

■ Of critical importance to Lehman's Motion to Dismiss is whether the transfers, which are indisputably illegal and unenforceable in Florida, have value. For purposes of Counts III and IV of the Shapiro Complaint, and Counts III and IV of the Capitol Complaint, the Transfers are not avoidable if Shapiro or Capitol received "reasonably equivalent value" in exchange.[7] With respect to Counts III and IV of each complaint, the Transfers are not recoverable from Lehman if he provided value.[8]

7. The trustee may avoid any transfer ... of an interest of the debtor in property, or any obligation ... incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily ... (B)(i) received less than a **reasonably equivalent value** in exchange for such transfer or obligation....
11 U.S.C. § 548(a)(1)(B) (emphasis added).

8. Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
(2) any immediate or mediate transferee of such initial transferee.
(b) The trustee may not recover under section l(a)(2) of this section from—(1) a transferee that takes for **value**, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided
11 U.S.C. § 550(a)(2) and (b)(1) (emphasis added).

9. Fla. Stat. § 849.14 states that:
Whoever stakes, bets or wagers any money or other thing of value upon the result of any trial or contest of skill, speed or power or endurance of human or beast, or whoever receives in any manner whatsoever any money or other thing of value staked, bet or

The Trustee argues that the Transfers were not made in exchange for value because the Transfers are gambling debts that are illegal[9] and unenforceable[10] in Florida. The Defendant counters,[11] citing to *Kaler v. Able Debt Settlement, Inc. (In re Kendall)*, 440 B.R. 526 (8th Cir. BAP 2010), that just because a debt is illegal or unenforceable does not *ipso facto* mean that the debt didn't provide value.

■ Section 548(d) defines "value" as "property, or satisfaction or securing of a present or antecedent debt of the debtor...." "Reasonably equivalent value" is

wagered, or offered for the purpose of being staked, bet or wagered, by or for any other person upon any such result, or whoever knowingly becomes the custodian or depositary of any money or other thing of value so staked, bet, or wagered upon any such result, or whoever aids, or assists, or abets in any manner in any of such acts all of which are hereby forbidden, shall be guilty of a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083.

10. Fla. Stat. § 849.26 states that:
All promises, agreements, notes, bills, bonds or other contracts, mortgages or other securities, when the whole or part of the consideration if for money or other valuable thing won or lost, laid, staked, betted or wagered in any gambling transaction whatsoever, regardless of its name or nature, whether heretofore prohibited or not, or for the repayment of money lent or advanced at the time of a gambling transaction for the purpose of being laid, betted, staked or wagered, are void and of no effect; provided, that this act shall not apply to wagering on pari-mutuels or any gambling transaction expressly authorized by law.

11. The Defendant asserts that repayment of a debt by the party owing the debt to the party to whom the debt is owed can never be the subject of a fraudulent conveyance action, only a preference action. Putting aside for the moment the illegality of the contract, there is no dispute that Shapiro "owed" Lehman the money he paid to Lehman.

not defined in the Bankruptcy Code. What is "reasonably equivalent value" is predominantly a factual determination. *Senior Transeastern Lenders v. Official Committee of Unsecured Creditors (In re TOUSA, Inc.)*, 2012 WL 1673910 (11th Cir. May 15, 2012); *Nordberg v. Arab Banking Corp. (In re Chase & Sanborn Corp.)*, 904 F.2d 588, 593 (11th Cir.1990). In determining "reasonably equivalent value" courts consider the good faith of the parties, the fair value of the property and what the debtor actually received, and whether it was an arm's length transaction. *In re Leneve*, 341 B.R. 53, 57–8 (Bankr.S.D.Fla.2006).

There are some cases that hold that a debt that is otherwise unenforceable or illegal nonetheless provides reasonably equivalent value.[12] In each of these cases courts have found that there was a value that could be measured in an unenforceable debt or a debt arising from an illegal transaction. In the *Kaler* case, the court, after holding that the bankruptcy court did not err in finding that the contract in question was legal, noted, in dicta, that "the mere fact that a contract is void, unenforceable, or illegal does not require a finding that there was no reasonably equivalent value for purposes of § 548(a)(1)(b)." 440 B.R. at 532. The *Kaler* court reasoned that since the value of the contract to the debtor could be measured, then the defendant provided "reasonably equivalent value," even if the contract was illegal. The *Kaler* court upheld the bankruptcy court's finding that there was a fair market value for the services provided, that the parties acted in good faith, and that the contract was an arm's length transaction.[13]

I do not disagree that there are instances where gambling, and payment of a gambling debt, may provide value to the gambler. In *Allard v. Flamingo Hilton (In re Chomakos)*, 69 F.3d 769 (6th Cir.1995), the court did an excellent job of describing the intangible, but measurable benefits of gambling, even when a debtor loses.[14] However, it is important to emphasize that the *Chomakos* court found "where gambling is **lawful**, as it was in the case at bar, the placing of a bet gives rise to legally enforceable contract rights. These rights

12. *See infra* note 19.

13. The Trustee argues that *Kaler* is decided incorrectly, and since I am not bound by *Kaler*, I should not follow its reasoning. The Trustee further argues that *Kaler* is factually distinguishable because the Eighth Circuit Bankruptcy Appellate Panel upheld the bankruptcy court's determination that the contract in *Kaler* was lawful. Further, the defendant in *Kaler*, a debt settlement company, actually provided a service that is not inherently unlawful and for which a market exists. The North Dakota statute discussed in *Kaler*, which has since been repealed, did not ban debt settlement services, it simply established parameters regarding who could provide debt settlement services.

14. The trustee argues that Mr. and Mrs. Chomakos did not occupy a bargaining position equal to Flamingo's, and the gambling trans-

actions were therefore not at arm's length. But this argument overlooks the governmental and business forces by which Flamingo was constrained. Flamingo was subject to state regulations designed to create a reasonably level playing field, and Flamingo had to compete with nearby casinos to which Mr. and Mrs. Chomakos and all other customers were free to take their business. Without reasonably generous payouts and competitive odds, Flamingo could not hope to attract the repeat customers on whom, according to the evidence, Flamingo and other casino operators depend for survival. "[T]he quid pro quo," as the bankruptcy court observed, "was established in the context of a state regulated business, existing in an open competitive marketplace responding and responsive to desires of legitimate tourists pursuing and engaging in a legal and legitimate pursuit."

*Chomakos*, 69 F.3d at 772. (emphasis added) (citations omitted).

constitute 'property'...." 69 F.3d at 771 (emphasis added).

The gambling in this case is different. This is not a case where the debt in question is legal in a jurisdiction other than Florida but may not be enforceable in Florida on public policy grounds.[15] This is in an instance where the very activity itself, private gambling within the State of Florida between two parties, is absolutely and unequivocally illegal under Florida law.[16]

The Defendant argues that gambling debts are not valueless per se and points out in support of his argument that Florida recognizes gambling debts that have been reduced to judgments in other states, allows gambling within its own state, and, indeed, through the Florida lottery, conducts its own gambling enterprise. The Defendant also cites to *Mirage–Casino Hotel v. Simpson, (In re Simpson)*, 319 B.R. 256 (Bankr.M.D.Fla.2003), which held that federal law applies in determining whether a claim is allowable and that federal law recognizes gambling claims as allowable. *Ergo*, Lehman argues, federal law recognizes that the payment of a gam-

bling debt constitutes "reasonably equivalent value." Defendant's counsel aptly described his particular argument this way— "there is no nexus between Florida's public policy on gambling, no matter how schizophrenic, and value." [17]

The Defendant argues that since Florida recognizes some forms of legal gambling, that it is not important or meaningful that the gambling involved in this case is illegal. As I have previously ruled in *Desert Palace, Inc. v. Hionas (In re Hionas)*, 361 B.R. 269 (Bankr.S.D.Fla.2006), it is not my place to modify a valid Florida statute even if Florida's view on gambling is schizophrenic, as Defendant's counsel argues. The Florida legislature has had ample opportunity to legalize all gambling, and, in this last legislative session, it spent a great deal of time on gambling. Ultimately the Florida legislature determined not to broaden the legalization of gambling beyond its current scope. Thus, it is certainly not my place to do otherwise.

I find more analogous the holding in *Armstrong v. Collins*, 2010 WL 1141158 (S.D.N.Y.2010), in which case the court held that there can never be measurable

---

**15.** If a gambling debt has been reduced to a judgment, Florida courts will enforce that foreign judgment under the full faith and credit clause of the United States Constitution. *M & R Investments Co., Inc. v. Hacker*, 511 So.2d 1099 (Fla. 5th DCA 1987).

**16.** *See supra* notes 9 and 10.

**17.** *Simpson* is distinguishable for two reasons. First, the *Simpson* case, as did *Desert Palace, Inc. v. Hionas (In re Hionas)*, 361 B.R. 269 (Bankr.S.D.Fla.2006), deals with the issue whether a claim based on a gambling debt can be an allowed claim pursuant to 11 U.S.C. § 502. Section 502 frames an allowable claim as one recognized under "applicable law", and has nothing to do with gauging what constitutes value in the context of a Chapter V avoidance action. Second, I would have ruled differently than Judge

Briskman on the issue that was before him. Judge Briskman held that, according to *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946), federal law is the "applicable law" by which the allowability of a claim is measured, that under federal law, claims are defined broadly, and thus a claim arising from a gambling debt should be allowed. While, like Judge Briskman, I agreed in *Hionas* that *Vanston* dictates that federal law should define what is the "applicable law", I ruled that the federal law that applies is conflicts law to determine what applicable law governs allowability of the claim. In this case, federal conflicts law would require I consider Florida law in determining any claim Lehman filed (which he did not). Under Florida law, a claim based on the gambling debt is not allowable because under applicable law it is unenforceable.

reasonably equivalent value for something that is absolutely illegal. In *Armstrong*, the defendant, an escort service owner, argued that funds paid to her by Mr. Yagalla, a Ponzi scheme operator, for escort services, were not recoverable because the services of the young ladies whose company she arranged provided "reasonably equivalent value" for the thousands of dollars per night charged. Rejecting this argument, the court held that "illegal consideration does not constitute reasonably equivalent value." *Armstrong*, 2010 WL at *30. "The payments Yagalla made for 'escorts' were in fact illegal payments for prostitutes, and as such, Braun did not provide reasonably equivalent value." *Id.* The gambling debt between Lehman and Shapiro was illegal. Certainly, one might argue, the pleasure Mr. Yagalla received for escort services is measurable, even more so than the pleasure Shapiro may have received from gambling. Indeed, taken to the extreme, one could argue that a successful murder for hire would provide measurable value to the payor, but I would hope one would be hard pressed to make that argument successfully in a fraudulent conveyance case.[18]

■ I recognize, but remain unpersuaded by the cases cited by the Defendant that hold that there is value in an illegal contract and that illegality only becomes an issue when considering the good faith defense. While, in fact, there may be instances in which a contract, or transaction, or event that is illegal or unenforceable might nonetheless support reasonably equivalent value, such as one that is illegal or unenforceable because a party was unlicensed, or a statute of limitations may have run, when the transaction is one that is absolutely prohibited by law it will rarely, if ever, constitute reasonably equivalent value.[19] In this instance I find a transaction that is illegal under the laws of the State of Florida will not support "value" for purposes of sections 548 or 550.

Accordingly, the Motion to Dismiss is granted in part and denied in part. The deadline for the Trustee to file an amended complaint in conformity with this decision has been set by separate order.

**ORDERED.**

---

18. While there is no question that murder, and in most jurisdictions, prostitution, are more serious crimes than gambling, this merely illustrates the need for a bright line test. What gauge, less than criminal behavior, provides the limitation? Should value be like obscenity, "you know it when you see it?" There is no question that what constitutes value in a particular case is fact driven, but there must be a point at which the line is drawn when illegal activity is involved.

19. *See e.g. Barber v. Golden Seed Co., Inc.*, 129 F.3d 382 (7th Cir.1997) (The court determined that an oral contract for seeds was valid under Illinois law, but even if the contract had been invalid under Illinois law, violation of Illinois law would not automatically make the contract unenforceable and void, especially when one side fully performed); and *In re 21st Century Satellite Commc'n, Inc.*, 278 B.R. 577 (Bankr.M.D.Fla.2002) (Payments to unlicensed brokers for the sale of participation interests ultimately found to be securities under Florida law did not have to be disgorged, if the brokers did not know of the unlawfulness of the transaction, because the brokers provided value).